Fabricant, Judith, J.
This action presents a dispute over insurance coverage for environmental contamination. Before the Court are cross motions for summary judgment between plaintiff President & Fellows of Harvard College (Harvard) and defendants Westchester Fire Insurance Company (Westchester) and United States Fire Insurance Company (US Fire, or, with Westchester, the insurers), along with a motion to dismiss by defendant Crum & Forster Holdings Corp. on the ground of lack of jurisdiction. For the reasons that will be explained, Harvard’s motion for summaiy judgment will be allowed as against the insurers, and Crum & Forster’s motion to dismiss will be denied without prejudice to renewal after discovery limited to the issue of personal jurisdiction.
BACKGROUND
The record before the Court establishes the following facts as undisputed. Westchester issued to Harvard a series of six comprehensive general liability and umbrella insurance policies covering the period of July 1, 1963, to July 1, 1972.[2] Pricing for the policies was based on an annual amount per student enrolled in the University. The policies did not refer to or incorporate any list of covered real properties, activities, or other risks associated with the insured. United States Fire Insurance Company now has responsibility for the Westchester policies.[3]
The insuring clause of the 1963-1969 CGL policy[4] requires Westchester to pay “all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss thereof, resulting from an occurrence.” The policy defines an “occurrence” as
an unexpected event or happening which results in . . . injury to or destruction of property during the policy period or a continuous or repeated exposure to conditions which results in . . . injury to or destruction of property during the policy period, provided the insured did not intend or anticipate that injury would result.
Westchester also agreed that “(w]ith respect to such insurance as is afforded under this policy, the company shall: (a) defend any suit against the insured alleging such injury, sickness, disease, or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent. . .” Endorsement #9, entitled “WORLD-WIDE COVERAGE,” amended the territorial scope of the coverage to include “occurrences which happen during the policy period anywhere in the world.”
On September 30, 1988, Harvard bought property located at 1609 Massachusetts Avenue, Cambridge. Among the commercial tenants then occupying the property was Crimson Cleaners, a dry cleaning business that had been operating there since the 1950s.[5] Crimson Cleaners and/or its predecessors used per-chloroethylene (PCE). In 1989 and early 1990, Harvard, through its environmental consultant, McPhail Associates, Inc. (McPhail) conducted an environmental site assessment of the property. The assessment confirmed the presence of PCE in shallow soils and groundwater “limited to localized areas of the parking lot, particularly in the area behind Crimson Cleaners.” According to the McPhail report, “the [PCE] in the groundwater, although in excess of normal background levels, is within acceptable limits and is considered to have no significant impact or threat of impact on the groundwater quality at the site.” Har *114 vard notified the Massachusetts Department of Environmental Protection (DEP), and conducted a limited removal action. That action, according to McPhail, achieved a permanent solution. DEP did not require further action at that time.
In November 2006, in the context of a construction project on the Harvard Law School campus, Harvard conducted groundwater sampling. Sampling results received on November 30, 2006, revealed the presence of PCE in groundwater at levels that, under regulatory standards in effect at that time,[6] required prompt notification of DEP pursuant to 310 C.M.R. 40.0000, etseq. Harvard gave the required notice to DEP, which, exercising its statutory and regulatory authority, determined that the situation constituted “a release or threat of release of material that constituted or could pose an immediate hazard.” On that basis, it orally directed Harvard to institute certain “Immediate Response Actions.”
On January 16, 2007, DEP issued a Notice of Responsibility (NOR) that identified Harvard as a “Potentially Responsible Party (PRP) liable for response actions and costs under G.L.c. 2IE, §5.” Harvard’s liability, the NORstated, was “joint and several, meaning that you may be liable for all response action costs incurred at the site, regardless of the existence of any other liable parties.” The NOR stated that PCE contamination existed at the Crimson Cleaners site and had migrated to additional properties owned by Harvard and others. It ordered Harvard to take certain specific, as well as other, more general, response actions, and advised that “[t]he subject site shall not be deemed to have had all necessary and required response actions unless and until all substantial hazards presented by the site have been eliminated and a level of No Significant Risk . . . exists or has been achieved . . .”
The NOR further advised Harvard that, if it did not comply, it “may be liable for up to three (3) times all response action costs incurred by MassDEP . . . [including], without limitation, the cost of direct hours spent by MassDEP employees arranging for response actions or overseeing work performed by persons other than MassDEP or their contractors, expenses incurred by MassDEP in support of those direct hours, and payments to MassDEP contractors”; that MassDEP could assess interest on costs at the rate of twelve percent compounded annually; that to secure payment, the Commonwealth could place liens on Harvard’s property and foreclose on those liens; that Harvard could also be liable for damages to natural resources; that civil and criminal liability could be imposed pursuant to G.L.c. 21E, §11; and that civil administrative penalties could be imposed under G.L.c. 21A, §16 for each violation of c. 21E, the Massachusetts Contingency Plan (MCP) or any “order, permit or approval issued thereunder.”[7]
Harvard proceeded with the response actions ordered by DEP, under the supervision of Licensed Site Professional (LSP) Deborah H. Gevalt and the firm of Haley & Aldrich. It also undertook a dendroecological investigation, which involved analyzing tree rings and their chemical compounds, so as to determine whether releases of PCE had occurred during the period of the Westchester policies. On November 29, 2007, while it awaited the results of the dendroecological assessment, Harvard’s attorney sent a letter to Westchester and Resolute Management Inc. (Resolute), the entity Harvard then believed was responsible for the Westchester policies, notifying them that it reserved the right to seek indemnification and defense under the policies for its investigation and response actions in response to the NOR.
Harvard’s attorney received a response in the form of a letter dated January 4, 2008, from Claims Specialist Steven Albertson. Albertson’s letterhead displayed the name “Crum & Forster” in large type, followed by “A Fairfax Company,” and then, in smaller type, the names of US Fire and two other companies. Albertson acknowledged receipt of Harvard’s notice, requested that Harvard direct all future correspondence to him “at Crum & Forster,” requested additional documentation, and represented that, upon review of documentation, “we will provide Harvard with a coverage determination.” Harvard provided the requested documentation, along with a cover letter expressing its understanding that Crum & Forster was responding on behalf of Westchester. After further correspondence between Harvard’s counsel and Al-bertson, Harvard’s counsel received an e-mail dated March 7, 2008, from a Boston attorney indicating that his firm had “been retained by Crum & Forster in connection with this matter,” and requesting further documentation.
On April .10, 2008, Harvard received the results of the dendroecological investigation, indicating that PCE had been released to and/or migrated into groundwater during the effective periods of one or more of the Westchester policies. Harvard’s counsel provided those results to the attorney for Crum & Forster in a letter dated April 17, 2008, and requested defense and indemnity under the Westchester policies. She provided various additional information over the next several months, in response to requests. In an October 15, 2008 email, counsel for Crum & Forster informed Harvard’s counsel that Harvard’s claim “is being discussed this week at the most senior management levels within the Crum & Forster organization.” Further correspondence and requests for information followed; in response, Harvard provided cost information.
By letter to Crum & Forster’s attorney dated March 5, 2009, Harvard’s attorney indicated that it was considering litigation as a result of Crum & Forster’s failure to respond to its coverage claim. A response *115 arrived in the form of a letter dated April 10, 2009, on Crum & Forster letterhead, signed by Agnes Reiss, “Manager—Latent Claims,” who identified herself as writing on behalf of US Fire. Ms. Reiss stated that US Fire “is unable to agree at this time that it owes coverage for these claims. As detailed below, it is apparent that this claim is clearly outside the coverage provided by certain of these policies. In other instances, we are presently unaware of facts suggesting a potential for coverage but are continuing to investigate under a reservation of rights and invite you to provide us with any further facts or documents that you feel might support coverage.”
The letter went on express a series of grounds for denying coverage, including that “we have not been able to locate any information ... which indicates that the contamination ... took place during the nine year period” of the policies in issue; that Harvard had acquired the property after the policy periods; and that “much of” the costs for which Harvard sought coverage “have been for remediation and improvements to Harvard’s own property.” Based on these grounds for denial of coverage, the letter asserted, US Fire “does not agree” that the NOR “triggers any obligation to defend or that the attorneys fees claimed by Harvard to date fall within the scope of any defense obligation.” The letter went on to assert that Harvard had failed to comply with policy requirements of timely notice; that it had made voluntary payments before giving notice to the insurers; and that Harvard had improperly characterized certain costs as defense.
After a series of further correspondence between attorneys, Harvard filed this action on December 21, 2009. The complaint seeks to establish the insurers’ obligation to reimburse Harvard the $5,589,053.77 it claims it has spent in response to the NOR, along with future costs, as well as to provide defense and indemnification in response to demands from third-party landowners alleging contamination of their property by migration of PCE. The complaint sets forth seven counts: declaratory judgment as to the insurers’ duty to defend and indemnify under the CGL and umbrella policies (counts I, III, v. and VI); breach of contract with respect to both defense and indemnity (counts II and IV); and violation of G.L.c. 93A (count VII). The complaint names Westchester, US Fire, and Crum & Forster Holdings Corp.; it alleges, “upon information and belief,” that the latter two “are legally responsible for” the policies issued by Westchester. Westchester and US Fire both answered, denying liability; US Fire also counterclaimed, seeking a declaration that it has no duty to defend or indemnify under any of the policies. Crum & Forster Holdings Corp. has not answered, but has instead moved to dismiss on the ground that the Court lacks personal jurisdiction over it. Harvard moves for partial summary judgment on counts I and II of its complaint; the insurers move for partial sum-maryjudgment on counts I-VI of Harvard’s complaint; and U.S. Fire moves for summary judgment on counts I-IV of its counterclaim.
DISCUSSION
1. Crum & Forster’s Motion to Dismiss.
Crum & Forster Holdings Corp. moves to dismiss for lack of personal jurisdiction. It provides evidence, through an affidavit of its corporate clerk, that it is a holding company incorporated in Delaware, with its office in New Jersey; that it has never issued insurance policies in any state; and that it has never done any business, owned any property, or had an office in Massachusetts. It offers also an affidavit of a vice president of US Fire, who attests that that company, not Crum & Forster Holdings Corp., owns the registered trademark “Crum & Forster.” (No. 26542288), that US Fire operates under the name Crum & Forster, and that it, not Crum & Forster Holdings Corp., communicated with Harvard under that name. These facts, if true—and examination of the correspondence Harvard offers reveals nothing to contradict them— would establish the absence of personal jurisdiction over Crum & Forster Holdings Corp. Harvard has not yet had a chance to conduct any discovery to test the truth of these assertions. The Court will permit it that opportunity, for a limited period of time. Accordingly, the Court will authorize discovery, to be completed within the next 90 days, limited to the issue of whether Crum & Forster Holdings Corp. conducts business in Massachusetts, either through US Fire or otherwise. The Court will deny the motion to dismiss without prejudice to renewal after completion of such discovery.
2. Harvard’s Motion for Partial Summary Judgment.
Harvard moves for summary judgment on counts I and II, seeking to establish the insurers’ duty to defend under two of the policies. Its theory, in substance, is that the NOR is equivalent to a suit for purposes of the duty to defend,[8] and that the insurers were obligated to defend based on the face of the NOR and of the policies, without consideration of any extrinsic information except insofar as such information would support defense.[9] Harvard argues also that the insurers’ refusal to do so was a breach of contract, the effect of which was to shift to the insurers the burden of proof on all issues of coverage. The insurers, acknowledging the general rule requiring defense if the complaint on its face falls within the policy, invoke a narrow exception, recognized in some cases, for situations involving “the existence of an undisputed extrinsic fact that takes the case outside the coverage.” Farm Family Mutual Insurance Company v. Whelpley, 54 Mass.App.Ct. 743, 747 (2002). That fact here, the insurers contend, is that Harvard purchased the property that was the site of the events giving rise to the liability long after the end of the term of the policies. Thus, the central question raised by these motions is *116 whether the policies cover liability arising from so-called after-acquired property.
The interpretation of an insurance policy is a question of law for the court, Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 146 (1982), and interpretation of unambiguous terms is appropriate for summary judgment. Sullivan v. Southland Life Ins. Co., 67 Mass.App.Ct. 439, 442 (2006). Where the provisions of an insurance policy are plainly expressed, the Court must enforce the policy in accordance with its terms, Cody, 387 Mass. at 146. Where the terms leave room for interpretation, the Court must interpret the policy in a manner consistent with the expectations of an objectively reasonable insured. McGregor v. Allamerica Ins. Co., 449 Mass. 400, 402 (2007); City Fuel Corp. v. National Ins. Co. of Hartford, 446 Mass. 638, 642-43 (2006). “[Exclusions from coverage are to be strictly construed so as not to diminish the protection purchased by the insured . . .” See Middlesex Ins. Co. v. American Employment Ins. Co., 9 Mass.App.Ct. 855, 856 (1980) (rescript); see also Bates v. John Hancock Mut. Life Ins. Co., 6 Mass.App.Ct. 823, 824 (1978).
The policies in issue here cover liability for injury to property “resulting from an occurrence.” Occurrence is defined to include an event or exposure “which results in . . . injury to or destruction of property during the policy period.” The policies apply to “occurrences which happen during the policy period anywhere in the world.” Nothing in the policies, at least nothing express, conditions coverage on the insured’s ownership of any properly at any time; indeed, nothing in the definition of occurrence, or anywhere else, refers to property ownership.
In the context of environmental claims, the Supreme Judicial Court has ruled that “the event giving rise to coverage under an occurrence-based policy is the happening of the actual property damage.” Trustees of Tufts Univ. v. Commercial Union Ins. Co., 415 Mass. 844, 851 (1993). See also Boston Gas Co. v. Century Indemn. Co., 454 Mass. 337, 358-59 (2009). Thus, “(s]o long as harm occurs during the policy period, the timing of other events—the act that caused the harm, the attachment of liability, the claim against the insured—is irrelevant.” David M. Smith, Sudden Exposure: Accessing Historic Insurance Policies for the Environmental Liabilities Associated with Newly Acquired Properties or Operations, 25 Ecology L.Q. 439, 443 (1998). See also Billings v. Commerce Ins. Co., 458 Mass. 195, 198 (2010) (time of occurrence under indemnity policy not when wrongful act was committed, but when complaining party was damaged).
Here, the NOR asserts liability for injury to property, without specifying the date of the injury. The additional information provided by Harvard to the insurers indicates that at least some part of the injury occurred within the period of the policies. Under the plain language of the policies, that is enough to bring the liability within the scope of coverage. The insurers argue, nevertheless, that coverage is implicitly excluded because Harvard did not own the property during the policy periods. Their reasoning, in substance, is that coverage in these circumstances would extend the insurers’ exposure beyond the policy periods, making the policies effectively perpetual. The Court recognizes the concern, but is not persuaded that it can properly address the problem by implying an exclusion that does not appear in the plain language of the policies.
The insurers assert that “insurance policies implicitly exclude coverage for after-acquired liabilities as a matter of law.” The cases it cites do not support that assertion. Most of the cases on which the insurers rely involve after-acquired entities, not after-acquired real estate. These decisions, while making reference to economic and policy concerns similar to those raised here, rest on interpretation of the language of the “named insured” provisions of the policies in issue. See e.g. Total Waste Mgmt. Co. v. Commercial Union Ins. Co., 857 F.Sup. 140, 146-47 (D.N.H. 1994); Textron, Inc. v. Aetna Cas. & Sun Co., 638 A.2d 537, 541 (R.I. 1994); Caterpillar, Inc. v. Solar Turbines, Inc., 282 Ill.App.3d 1065, 1070-73 (1996); Armstrong World Indus., Inc. v. Aetna Cas. & Surety Co., 45 Cal.App.4th 1, 52 Cal.Rptr.2d 690, 724-27 (1996); Cooper Cos., Inc. v. Transcontinental Ins. Co., 31 Cal.App.4th 1094, 1107 (1995); Chicago Bridge & Iron Co. v. Certain Underwriters at Lloyd’s, London, 1998 WL 1285608 at *3 [8 Mass. L. Rptr. 471] (Mass.Super.Ct. Apr. 30, 1998), aff'd on other grounds, 59 Mass.App.Ct. 646 (2003); United Tech. Corp. v. Liberty Mut. Ins. Co., 1993 WL 818913 at *9-10 [1 Mass. L. Rptr. 91] (Mass.Super.Ct. Aug. 3, 1993); Johnson Controls, Inc. v. Employers Ins., No. 89-CV-016174, slip op. at 7-8 (Milwaukee County Circuit Court, December 22, 1992).[10] These cases do not assist in interpretation of the policy provisions involved here.
One case on which the insurers rely addresses an issue that is closer, but still not identical, to that presented here; Upjohn v. Aetna Cas. & Sur. Co., 1991 WL 490026 at *3-4 (W.D.Mich. 1991). There the alleged liability arose from disposal of hazardous waste at various sites; ownership of property was not in issue. As to certain of the sites, the insured’s disposal activity began after the end of the policy periods, but contamination by others at those sites had occurred during the policy periods. The insured sought coverage for its joint and several liability, with other responsible parties, for all of the contamination. The Court held that the policies did not cover, because “there was no basis to hold Upjohn liable at the time of the property injury or destruction occurring during the years that [the] policies were in effect.” Id. at *5.
This Court finds that reasoning unpersuasive. The policy language, as quoted in the opinion, like the policy language here, made coverage dependent on whether the occurrence, defined as the injury, hap *117 pened during the policy period. The District Court’s analysis effectively substituted liability for injury in the definition of occurrence. This Court is not in a position to opine on Michigan law, which governed there, but understands Massachusetts law to prohibit that kind of judicial substitution of policy language.[11]
The parties have identified two federal cases that have addressed the precise question presented here, based on the same or substantially the same policy language. Both ordered coverage, based on the unambiguous terms of the policies. K.F. Dairies, Inc. & Affiliates v. Fireman’s Fund Ins. Co., 224 F.3d 922, 927-28 (9th Cir. 2000) (applying California law, expressing disagreement with two contrary decisions of California intermediate appellate courts); and Liberty Mut. Ins. Co. v. The Black & Decker Corp., No. 96-10804, Slip Op. (D.Mass. Dec. 5, 2003) (applying Massachusetts law).[12] In K.F. Dairies, Inc., the Ninth Circuit predicted that, contrary to the two intermediate appellate court rulings cited, the California Supreme Court would interpret the policies as providing coverage. Id. at 125. The two contrary rulings, the Court opined, departed from established California rules of law requiring interpretation and enforcement of unambiguous provisions of insurance policies according to their plain terms. Id.
Judge Woodlock, in Black & Decker, supra, similarly predicted that the Massachusetts Supreme Judicial Court will rule in accord with the unambiguous language of the policy, which provides coverage. Slip op. at 69. Judge Woodlock commented that considerations of fairness and the nature of underwriting risk, discussed in some of the cases cited by the insurers here, “are beside the point.” Id. at 70. Even if such considerations were pertinent, he observed, “it is no more unfair to require the insurer to pay for damage preceding the insured’s involvement with a site than to require the insured to pay for that damage. The unfairness springs from the statutory regime, not from applying the plain language of the policy to liability created by that statute.” Slip op. at 71. Accord Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wash.2d at 679 (“If there is unfairness it is the statute which creates the liability, not the insured which attempts to insure against it”).
This Court agrees with Judge Woodlock that, under established Massachusetts law, the unambiguous terms of the policies govern. Those terms require coverage, regardless of the timing of Harvard’s acquisition of the properly. The considerations of fairness argued by the insurers, even if the Court found them persuasive, which it does not, could not trump the plain terms of the policy. In this case, moreover, those considerations are particularly unpersuasive, since the record establishes that the insurers set pricing for the policy on a per-student basis, without regard to any evaluation of risks arising from Harvard’s ownership of or activities on any properties. The Court therefore rejects the insurers’ defense based on an implied exclusion for so-called after-acquired property.
The insurers allude to certain other defenses, none of which provides a basis to withhold defense. They argue that Harvard breached the prohibition in the policy against voluntary payments. Except in unusual circumstances not present here, see Augat v. Liberty Mutual Ins. Co., 410 Mass. 117, 123 (1991) (prejudice presumed where insured entered into consent judgment), Atlas Tack Corp. v. Liberty Mutual Ins. Co., 48 Mass.App.Ct. 378, 383 (1999) (same), an insurer who disclaims coverage based on breach of the voluntary payment provision must prove actual prejudice. See also Sarnafil, Inc. v. Peerless Ins. Co., 418 Mass. 295, 305 (1994); Darcy v. Hartford Ins. Co., 407 Mass. 481, 490 (1990); Employers’ Liability Assur. Corp. Ltd. v. Hoechst Celanese Corp., 43 Mass.App.Ct. 465, 481 (1997). Thus far, at least, the insurers have not attempted to make that showing.[13]
The insurers also argue that Harvard should be denied declaratory judgment because it has unclean hands. The basis for this theory is difficult to discern from the insurers’ memoranda, but appears to be the contention that Harvard acquired liability, to the detriment of the insurers, by buying property that it knew or should have known was likely to be contaminated. The Court seriously doubts whether such facts, if proven, would support denial of relief in an action such as this, which is founded substantively on a claim of breach of contract. See, e.g., Saggese v. Kelley, 445 Mass. 434, 444 (2005). In any event, the facts on which the unclean hands theory depend are hardly undisputed, such as to provide a ground for the insurers to refuse to defend. See Farm Family Mutual Insurance Company v. Whelpley, 54 Mass.App.Ct. at 747.
The Court concludes that Harvard is entitled to summary judgment on count I of the complaint, which seeks a declaration that the insurers are obligated to defend it against the NOR, and on count II, which claims breach of that duty. Three consequences follow from that determination. First, the insurers must reimburse Harvard for costs it has expended for its defense.[14] Second, the burden of proof as to any issue of coverage falls to the insurers. See Polaroid Co. v. Travelers Indem. Co., 414 Mass. 747, 764 (1993); see also Highlands Ins. Co. v. Aerovox, Inc., 424 Mass. at 230 n.6 (burden shifting “necessary to protect the insured because the failure to defend might make it more difficult for the insured to prove that the underlying claim falls within the insurance coverage”). Third, at the conclusion of this action, Harvard will be entitled to recover its costs, including attorneys fees, incurred in enforcing its contractual right to defense. See Rubenstein v. Royal Ins. Co. of America, 429 Mass. 355, 358 (1999).
*118 3. The Insurers’ Motion for Partial Summaiy Judgment.
The insurers move for summaiy judgment on six counts of Harvard’s complaint (all but the c. 93A count), and on US Fire’s counterclaims seeking a determination that the insurers have no duly to defend or indemnify. The parties’ arguments are essentially the same as those already discussed with respect to Harvard’s motion, and the Court’s conclusions are the same. For the reasons already discussed, the insurers’ motion will be denied.
CONCLUSION AND ORDER
For the reasons stated, Defendant Crum & Forster Holdings Corp.’s Motion to Dismiss is DENIED, without prejudice to renewal after discovery for a period not to exceed 90 days from the date of this order, addressed to the issue of whether Crum & Forster Holdings Corp. does business in Massachusetts. Plaintiff President & Fellows of Harvard College’s Motion for Summary Judgment is ALLOWED as to counts I and II of its complaint. Defendants’ Motion for Partial Summaiy Judgment is DENIED. The Clerk will schedule a status conference, before the undersigned, for the earliest available date. At that time counsel should be prepared to identify any further discovery or other proceedings that may be necessary to resolve all remaining issues.

The policies at issue are the following:
Policy Period CGL Policy Umbrella Policy
7/1/63-7/1/66 CAG 3-02-06 CCL 6-66-12
7/1/66-7/1/69 CAG 43-96-90 CCL 6-66-23
7/1/69-7/1/72 GA 35-63-44 CCL 6-73-73

A letter from US Fire to Harvard’s counsel, dated April 10, 2009, acknowledges that US Fire “is responsible for certain Westchester policies either through novation or as the assumptive reinsurer.”

The subsequent policies have slight but not material differences in phrasing.

Crimson Cleaners continued operations until its lease expired on July 31, 2007.

 The reporting threshold had tightened since 1990.

G.L.c. 21E, §11 provides, in relevant part:
In addition to liability for costs incurred by the commonwealth for the investigation, assessment, containment and removal of a release or a threat of a release of oil or hazardous material, any person who violates any provision of this chapter, or any order or regulation issued or adopted thereunder: (a) shall be subject to a civil penalty not to exceed $50,000 for each such violation; or (b) shall be punished by a fine of not more than $50,000, or by imprisonment for not more than two years in a house of correction, or both, for each such violation . . .
G.L.c. 21A, §16 provides, in relevant part:
The department may assess a civil administrative penalty on a person who fails to comply with any provision of any regulation, order, license or approval issued or adopted by the department, or of any law which the department has the authority or responsibility to enforce . . .

The Court agrees with Harvard on this point. See Hazen Paper Co. v. United States Fid. & Guar. Co., 407 Mass. 689, 694-95 (1990). The NOR in issue here much more closely resembles the PRP notice issued by the EPA in Hazen, demanding response actions for contamination from releases of hazardous materials, which the Court held the insurer was bound to defend, than the notice issued in that case by DEQE of a “threat of release,” which the Court held did not obligate the insurer to defend. See also Ryan v. Royal Ins. Co. of America, 916 F.2d 731, 738 (1st Cir. 1990), and cases cited; Zecco Inc. v. The Travelers, Inc., 938 F. Supp. 65, 68-69 (D.Mass. 1996).

As defendant acknowledges, this is the usual rule. See Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 394 (2003); Liberty Mut Ins. Co. v. SCA Servs., Inc., 412 Mass. 330, 337 (1992); Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 146 (1984); Desrosiers v. Royal Ins. Co. of America, 393 Mass. 37, 40 (1984); Sterilite Corp. v. Continental Cas. Co., 17 Mass.App.Ct. 316, 324 n.17 (1983) (“it is the claim which determines the insurer’s duty to defend; and it is irrelevant that the insurer may get information from the insured, or anyone else, which indicates, or even demonstrates, that the injury is not in fact covered” (internal quotations omitted)). Information known to the insurer that brings the claim within the scope of coverage may trigger the duty to defend even if the complaint alone would not. Boston Symphony Orchestra v. Commercial Union Ins. Co., 406 Mass. 7, 10-11 (1989). But the contrary is not the case; where a complaint on its face is susceptible of a reading that brings the claim within the policy, the insurer cannot rely on facts outside the complaint to justify a unilateral refusal to defend. Sterilite, supra.

The “named insured” provisions in these cases refer to the named insured and any entity “now or hereafter” affiliated with it or owned, operated or controlled by it. The cases generally interpret “hereafter” as limited to the policy period. See, e.g., Total Waste Mgmt. Co. v. Commercial Union Ins. Co., 857 F.Sup. at 147.

 Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wash.2d 654, 679-81 (Wash. 2000), like Upjohn, supra, involved property not owned by the insured, but where the insured had disposed of hazardous waste. As in Upjohn, the insured’s involvement with the site post-dated the policies, but the insured was jointly and severally liable with other responsible parties for contamination during the policy period. Id. at 681. Relying on the Ninth Circuit’s decision in K.F. Dairies, Inc. & Affiliates v. Fireman's Fund Ins. Co., 224 F.3d 922, 927-28 (9th Cir.2000), to be discussed further infra, and rejecting public policy arguments of the sort that persuaded the Court in Upjohn, the Washington Supreme Court ordered coverage. Id. at 682. Highlands Ins. Co. v. Aerovox Inc., 424 Mass. 226 (1997), arose from somewhat analogous facts. The insured sought coverage for its joint and several liability for contamination of a waste disposal site, where at least part of the contamination had occurred long before the insured ever shipped waste to the site, and before the policy period. Id. at 227-28. The decision does not suggest that the insurer ever raised any defense based on that sequence. Id.

The two California intermediate appellate court cases discussed in K.F. Dairies, Inc. , and also in Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wash.2d at 679-81, are A.C. Label Co. v. Transamerica Ins. Co., 48 Cal.App.4th 1188, 56 Cal.Rptr.2d 207 (1996); and FMC Corp. v. Plaisted and Companies, 61 Cal.App.4th 1132, 72 Cal.Rptr.2d 467 (1998). See also Tosco Corp. v. General Ins. Co. Of America, 85 Cal.App.4th 1016, 1020-23, 102 Cal.Rptr.2d 657 (2000).

The insurers suggest that they may, at some future date, claim breach of th'e requirement of prompt notice. The Court does not address that hypothetical possibility, except to note that the insurers would have the burden to prove actual *119 prejudice there as well. Darcy v. Hartford Ins. Co., 407 Mass. at 490.

Allocation of the costs for which Harvard seeks reimbursement as between defense and indemnity is beyond the scope of the present motions, and may require further discovery.