# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-2775, 11-2789 & 11-2961

AMERICAN SAFETY CASUALTY INSURANCE CO.,

*Plaintiff, Counterdefendant, Appellant,*

*and*

SCOTTSDALE INSURANCE CO.,

*Plaintiff, Counterdefendant, Appellee,*

*v.*

CITY OF WAUKEGAN, ILLINOIS,

*Defendant-Appellee, Counterplaintiff-Appellant,*

*v.*

INTERSTATE INDEMNITY CO.,

*Counterdefendant-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 1990—**Virginia M. Kendall**, *Judge*.

ARGUED FEBRUARY 21, 2012—DECIDED MARCH 16, 2012

Before EASTERBROOK, *Chief Judge*, BAUER, *Circuit Judge*, and SHADID, *District Judge*.[*]

EASTERBROOK, *Chief Judge*.    In 1989 S. Alejandro Dominguez was arrested for home invasion and sexual assault. In 1990 he was convicted of these offenses. In 1993 he was released on parole. In 2002 he was exonerated by DNA evidence, and in 2005 he received a pardon from the Governor of Illinois. As a matter of Illinois law, his claim for malicious prosecution accrued in 2002 with his exoneration. *Cult Awareness Network v. Church of Scientology International*, 177 Ill. 2d 267 (1997) ("favorable termination" of the proceeding is an element of the tort). As a matter of federal law, his constitutional claims under 42 U.S.C. §1983 accrued in 1989 and 2002. Claims related to wrongful arrest accrue on the date of the arrest, see *Wallace v. Kato*, 549 U.S. 384 (2007), but claims related to wrongful conviction do not accrue until the conviction has been invalidated, see *Heck v. Humphrey*, 512 U.S. 477 (1994).

Dominguez sued in 2004 under both state and federal law. His claims based on wrongful arrest were dismissed as untimely. His claims based on malicious prosecution (state law) and concealment of exculpatory evidence (federal law) were tried. A jury returned a verdict in his favor and awarded approximately $9 million against Paul Hendley of the Waukegan police; the City of Waukegan was dismissed as a party but is liable

---

[*] Of the Central District of Illinois, sitting by designation.

as an indemnitor. We affirmed that judgment. *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008).

Waukegan has insurance covering misconduct by its law-enforcement personnel. Scottsdale Insurance under-wrote the primary policies for 1989 and 1990; American Safety Casualty Insurance underwrote the primary policy for 2002. (The City had excess policies too; we disregard most of them to simplify the exposition.) Other insurers issued policies for the years in between. Waukegan notified its carriers of Dominguez's suit—and all refused to defend or indemnify. Each carrier asserted that the policy for some other year applied. Instead of doing the sensible thing—providing the City with a defense while deciding among themselves, perhaps through arbitration, which was responsible—all of the carriers left Waukegan to its own devices. None lifted a finger to assist the City, and none bothered to seek a declaratory judgment of non-coverage until after the jury had returned a verdict for Dominguez.

American Safety began this proceeding in 2007 under the diversity jurisdiction—against its customer, the City, rather than against the other carriers to work out which policy or policies applied. Waukegan brought some other carriers into the suit and filed a counterclaim, seeking attorneys' fees and penalties under 215 ILCS 5/155 on the ground that American Safety and some other insurers had acted vexatiously and unreasonably by failing to defend or seek declaratory relief before the trial began. The district court issued a series of opinions concluding that American Safety's policy applies, that

it must indemnify Waukegan for the verdict against Hendley (plus interest), and that it must reimburse the City for the legal expenses it incurred in defending Dominguez's suit and the declaratory-judgment action. The two principal opinions appear at 776 F. Supp. 2d 670 (N.D. Ill. 2011), and 776 F. Supp. 2d 717 (N.D. Ill. 2011). We mention a third opinion later.

The district court concluded that *National Casualty Co. v. McFatridge*, 604 F.3d 335 (7th Cir. 2010), determines which policy applies. *McFatridge* holds that, under Illinois law, the issuer of the policy in force on the date a convict is exonerated must defend and indemnify an insured whose law-enforcement personnel violate the Constitution (or state law) in the process of securing a criminal conviction. American Safety, joined by an excess carrier (Interstate Indemnity Co.) and the American Insurance Association as *amicus curiae*, asks us to overrule *McFatridge* or certify the issue to the Supreme Court of Illinois.

*McFatridge* relied on a rule of both state law (*Cult Awareness Network*) and federal law (*Heck*): to prevail for malicious prosecution or constitutional wrongs that led to a conviction, the plaintiff must be exonerated. Because the victim has no claim until then, the relevant "occurrence" for the purpose of determining insurance coverage is exoneration, the final element of the legal claim. We supported this conclusion by observing that *Security Mutual Casualty Co. v. Harbor Insurance Co.*, 65 Ill. App. 3d 198 (1978), had held exactly this as a matter of Illinois law. Although the Supreme Court of Illinois

reversed the appellate court's decision, see 77 Ill. 2d 446 (1979), it did so on the basis of an arbitration clause rather than any disagreement with the court's resolution of the merits. When we decided *McFatridge* in 2010, *Security Mutual* had been unquestioned substantively in Illinois for 32 years, and we saw no reason to think that it misstated Illinois law. It has now stood unquestioned for 34 years—no court in Illinois has so much as hinted at doubts about its conclusion, or that of *McFatridge*—and we therefore have no greater reason today than we did in 2010 to believe that the Supreme Court of Illinois will take a different view.

American Safety and Interstate Indemnity contend that *McFatridge* erred in looking to the state (and federal) elements of the claim rather than to the language of the insurance policy. The policy that American Safety issued applies to "occurrences" during the policy year (it is not a claims-made policy) and, through a chain of references, defines "occurrence" for law-enforcement coverage this way:

> injury, other than "Bodily Injury", arising out of one or more of the following offenses: (a) False arrest, detention or imprisonment; (b) Malicious prosecution; . . . (g) Violations of the Federal Civil Rights Act of 1871 or 42 U.S.C. 1983 and similar laws.

Dominguez was arrested in 1989 and prosecuted in 1990; those must be the years of the "occurrences" under this definition, American Safety and Interstate Indemnity insist. But how could "malicious prosecution" have

occurred in 1990 when, as a matter of state law, exoneration is an element of the tort? Hendley's *misconduct* occurred in 1989 and 1990, but the policy does not define the "occurrence" as misconduct by a law-enforcement officer. It defines the "occurrence" *as the tort* under state or federal law—and, in both bodies of law, the tort occurs when its last element comes into being. For misconduct that causes imprisonment, that final element is exoneration, which happened in 2002. Until then, Dominguez could not establish either "malicious prosecution" or a "violation" of §1983. (American Safety does not contend that exoneration is just a precondition to suit, rather than an element of the tort.)

American Safety, Interstate Indemnity, and the American Insurance Association observe that only one other state, Louisiana, has held that exoneration marks the "occurrence" for insurance coverage of malicious-prosecution claims. *Sauviac v. Dobbins*, 949 So. 2d 513, 519 (La. App. 2006). Courts in six states and the District of Columbia have held that the "occurrence" occurs when the wrongful prosecution is filed or ends in conviction. See *Zurich Insurance Co. v. Peterson*, 232 Cal. Rptr. 807, 813 (Cal. App. 1986); *Billings v. Commerce Insurance Co.*, 458 Mass. 194, 197–200 (2010); *American Family Mutual Insurance Co. v. McMullin*, 869 S.W.2d 862, 864 (Mo. App. 1994); *Paterson Tallow Co. v. Royal Globe Insurance Cos.*, 89 N.J. 24, 36–37 (1982); *Newfane v. General Star National Insurance Co.*, 14 A.D.3d 72, 76–77 (N.Y. 2004); *Consulting Engineers, Inc. v. Insurance Co. of North America*, 710 A.2d 82, 86–88 (Pa. Super. 1998), affirmed without opinion, 560 Pa. 247 (2000); *S. Freedman & Sons v.*

*Hartford Fire Insurance Co.*, 396 A.2d 195, 199 (D.C. App. 1978). (A dozen or so federal district courts and courts of appeals have predicted that states would reach one or another result on this subject; we disregard them because decisions by state tribunals are the benchmark in diversity litigation.) *McFatridge* thus represents a minority view, which the insurers (and the Association) urge us to abandon.

A minority it may be, but *McFatridge* does follow the lead of the only Illinois appellate decision on the issue. Contrary decisions pay little attention to the language of the policies. American Safety's policy defines "occurrence" (perhaps the policies in other cases did not), and as we have stressed the definition identifies the *tort* rather than the *misconduct* as the "occurrence." The most fully reasoned of the contrary decisions is *Billings*, which did not discuss the policy's language but did rely on a norm in Massachusetts insurance law that, when a tort spans multiple years, the year in which injury occurs marks the "occurrence." Think, for example, of a defectively designed product. The negligent design may happen in Year One, the product be manufactured in Year Three, and the injury occur in Year Five. In Massachusetts and most other states the "occurrence" is assigned to Year Five rather than the year of the negligent design, manufacture, or other delict. See Allan D. Windt, 3 *Insurance Claims and Disputes* §11:4 (5th ed. 2011) (collecting cases from many jurisdictions). *Billings* observed that the first injury from malicious prosecution comes at the time of the prosecution. That's true enough—but *Billings* may have

generalized inaccurately from the doctrine that the injury marks the occurrence. For most torts the injury is the *final* element; there's no tort without injury, and once injury does occur the tort is complete. What happens later is irrelevant. But that's not true of malicious prosecution or constitutional wrongs that lead to criminal convictions. For these torts, exoneration is the final element. Perhaps the lesson *Billings* should have drawn from the cases is that the final element of the tort marks the occurrence. That's the lesson *McFatridge* drew.

Scottsdale Insurance Company, which underwrote Waukegan's coverage in 1989 and 1990, was one of the insurers in *McFatridge* and believes that our decision is sound—and that the position of its own trade association is incorrect. Scottsdale has an obvious interest in avoiding liability in this litigation, but there are also strong practical reasons behind its position. Under *McFatridge* and *Security Mutual,* insurers can adjust their exposure by changing the language in their policies, defining the "occurrence" as the misconduct rather than the completed tort. The Association's position, by contrast, would impose on insurers a rule that they cannot change by contract (except by moving from occurrence to claims-made policies). Why would a trade association want such an outcome?

The American Insurance Association's position also implies a long tail on liability, which is opposite to the industry's usual view that liability should be as close as possible to the policy dates. Insurers want to be able to

close the books on their obligations, so that they know whether they have made a profit—and so that they can adjust prices to reflect the current riskiness of the activity they are insuring. Yet the Association's submission implies a long tail on liability, and a corresponding need to retain reserves for decades. Here the "occurrence" would be 12 years after the 1990 policy expired, and the suit 14 years after the policy's expiration. It could just as well be 22 or 32 years afterward, as it may take a long time to demonstrate innocence conclusively.

Delay harms not only the insurers but also their customers. Municipalities such as Waukegan often secure insurance through brokers, which may go out of business during the years between coverage and exoneration; insurers themselves may go out of business. If the municipality handles its own insurance procurement, it may send the files to storage after five or ten years, then encounter difficulty in identifying who provided coverage many years earlier. Something like this seems to have happened in this very case. Waukegan notified American Safety and other carriers in 2004, soon after Dominguez filed suit, but did not notify Scottsdale until 2006. It took Waukegan more than two years to track down the policies from 1989 and 1990, which were in effect 15 years before Dominguez sued. But Waukegan had no trouble finding the policies that covered the year 2002, when Dominguez was exonerated.

Much of the trade association's brief supposes that *McFatridge* established a "multiple trigger" approach. Insurers have long opposed doctrines that make

multiple policies responsible for a single loss. Such doctrines increase the number of risks within each policy year and can effectively nullify policy limits. If ten policies are applied to a single casualty, and each policy has a $1 million limit per occurrence, the insured ends up with $10 million in coverage per occurrence, even though it paid for only $1 million in coverage. Continuous-trigger rulings in asbestos cases have been the ruin of more than one insurance company. But *McFatridge* rejected an argument for continuous or multiple triggers. One episode of malicious prosecution (or constitutional violations leading to wrongful conviction) has just one trigger: exoneration. There can be a second claim. As the Supreme Court held in *Wallace*, wrongful arrest is a distinct theory of liability that can be pursued immediately after the arrest. Dominguez made a claim for wrongful arrest in 1989, but he lost under the statute of limitations (two years in Illinois). His suit in 2004 was 13 years too late. This means that only the policies covering Waukegan for the year 2002 matter.

American Safety, Interstate Indemnity, and the Association ask us to certify this subject to the Supreme Court of Illinois if we are inclined to stick with *McFatridge*. Certification may be appropriate when decisions of intermediate state courts conflict, but as we have observed there is just one relevant decision in Illinois. Certification may be appropriate when an issue is recurring and important, but the fact that state courts in Illinois have not had any decisions on this subject since 1978 implies that it is not often litigated. (Perhaps insurers regularly work year-of-coverage disputes out among

themselves, or through arbitration, as we suggested they should have done here.) Certification also may be appropriate when the nature of the parties' citizenship, or a link between state and federal claims, makes it likely that the litigation regularly will occur in federal court. Then certification may be the only way to allow the state courts to resolve an issue of state law. See *Todd v. Societe BIC, S.A.*, 9 F.3d 1216 (7th Cir. 1993) (en banc); *Chicago v. StubHub!, Inc.*, 624 F.3d 363 (7th Cir. 2010). As far as we can see, however, most insurance disputes in Illinois are litigated in state court; there's no reason why the year of the "occurrence" for malicious prosecution claims cannot be resolved by the Illinois judiciary, which can disapprove *McFatridge* if persuaded that we have misunderstood Illinois law. The reason *this* case is in federal court is that American Safety filed here. If it genuinely wanted the views of the state judiciary, it should have brought this declaratory-judgment action in state court.

This completes our discussion of the only issues raised by Interstate Indemnity and the trade association. American Safety presents several additional challenges to the district court's decision. One is that it did not have to defend Waukegan until the City had incurred and paid legal expenses exceeding the $100,000 deductible (which the policy calls a "self-insured retention"). Waukegan's legal bill in the Dominguez suit exceeded $1 million, so it must have incurred $100,000 in fees long before the trial, yet American Safety still refused to defend it. No matter, the insurer replies; until the City *paid* the bill it hadn't exhausted the deductible and still

had to defend itself. If it did not have a duty to defend until after the trial was over, American Safety insists, it cannot be held liable under 215 ILCS 5/155 for unreasonable and vexatious failure to defend. We think, however, that this line of argument *exemplifies* American Safety's unreasonable and vexatious treatment of Waukegan.

Let us start with the policy's language. It provides: "We shall have the right and duty to select counsel and defend any claims to which [this policy] applies. Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments and settlements." This language sets an end (at the policy limit) on the duty to defend; it does not postpone the beginning of the duty until Waukegan has paid $100,000 from its own pocket. The insurer wants us to add a condition that can't be found in the policy—or for that matter in Illinois law. It does not cite any statute or decision providing that an insurer's duty to defend begins only after the insured's expenses exceed the deductible. Many Illinois cases imply that the duty to defend begins the moment suit is filed. See, e.g., *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 373 Ill. App. 3d 895 (2007); *Casualty Insurance Co. v. Town & Country Pre-School Nursery, Inc.*, 147 Ill. App. 3d 567 (1986). American Safety does not cite or discuss any of them.

Doubtless a policy could be written to postpone the defense obligation until the deductible has been paid out. *United States Fire Insurance Co. v. Scottsdale Insurance Co.*, 264 S.W.2d 160, 173 (Tex. App. 2008), involved such a

policy. But American Safety does not contend that the duty-to-defend language of its own policy is similar to the policy in *United States Fire*. Instead it rests on some language in the deductible clause that, American Safety insists, shows that it has no obligation at all until the deductible has been disbursed. Yet it is essential to read all of a policy's clauses together. Giving the deductible clause an interpretation that effectively nullifies the defense clause would be unsound. Both clauses can be given meaning if the "obligation" to which the deductible clause refers is the obligation to indemnify, not the obligation to defend.

What sense would it make for an insurer to put defense off until the insured has retained and paid a team of lawyers to undertake the tasks? American Safety reads the deductible as abrogating the duty to defend—its argument, recall, is that it *never* had to defend Waukegan, even though the City incurred and paid more than $1 million in legal fees—which would make the defense clause in the policy empty. Even a $1,000 deductible could make a promised defense unavailable, unless the client took care to pay its lawyer a retainer equal to the deducible. Then, having paid the retainer, the client would tell its lawyer "Never mind!" and hand the defense over to the insurer. Or Waukegan (which had good credit and did not not need to pay a retainer to hire counsel) might have asked for its lawyer to send it a bill at the $100,000 point, paid, and *then* handed the defense over to American Safety, which would have had to hire a new law firm that would have covered the same ground, at extra expense (and

perhaps needing a delay that the court would not tolerate). This would also be true if the deductible were administered on an accrual basis, rather than a cash basis as American Safety insists it must be.

The defense clause in an insurance policy has two functions. One is to give the client access to counsel without the need to pay in advance (a benefit that American Safety wants to deny its insured). The other—and the more important from the insurer's perspective—is to give the insurer the right to control the defense. Insurers know which law firms have the expertise for the job; and, since the insurer has a great deal of money at stake (American Safety and Interstate Indemnity had an aggregate $10 million exposure in the Dominguez litigation), it needs a defense that will protect its interest. (If an insurer thinks that the damages may exceed the policy limits, it might be inclined to protect its own interest at the expense of its customer's. See *R.G. Wegman Construction Co. v. Admiral Insurance Co.*, 629 F.3d 724, rehearing denied, 634 F.3d 731 (7th Cir. 2011). But that's not a problem in the current situation.) Waukegan, by contrast, does not necessarily know which lawyers are good at defending suits like the one Dominguez filed—and, more to the point, is not seeking to protect its own pocketbook.

Waukegan knew that one of its insurers would have to pay in the end, even though they quarreled among themselves about which would be responsible. With other people's money at stake, would Waukegan pay top dollar for a good law firm? Would it monitor the

defense as carefully as an insurer? We don't understand why American Safety or any other insurer would want its client to manage the defense of a suit such as the one Dominguez filed. Indeed, American Safety contends that Waukegan and its law firm bungled the defense by agreeing to indemnify Hendley. We discuss below American Safety's argument that this lets it off the hook. It is enough for now to say that, by insisting that an insured manage and pay for the defense in a suit such as this, an insurer disserves its own interests. It is the sort of desperate argument that an insurer may advance after it failed to defend for other reasons; prevailing on that argument in this suit would have saved American Safety about a million dollars but would have cost it much more in the long run.

American Safety's next argument is that damages under 215 ILCS 5/155 are inappropriate because it could not have anticipated *McFatridge*, and its refusal to defend therefore was not unreasonable or vexatious. *McFatridge* was decided in 2010, but *Security Mutual* was decided in 1978; it told American Safety that exoneration marked the "occurrence." American Safety not only refused to accept the sole decision on the subject by an Illinois court but also failed to cooperate with other insurers so that Waukegan could be protected while the carriers wrangled among themselves about which policy applies. Leaving Waukegan in the lurch, with each insurer pointing the finger at another, was unreasonable. If American Safety was in genuine doubt, it could have filed a declaratory-judgment action (preferably against

the other insurers rather than Waukegan) in 2004; instead it sat on its hands. The district court did not err in concluding that §155 covers this situation.

Next comes American Safety's argument that it was entitled to be passive because in 2004, shortly after Dominguez's suit began, the City told American Safety that it had been dismissed as a party. See *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978) (municipalities cannot be held vicariously liable in suits under §1983). The City was held liable in the end as an indemnitor of Hendley's obligation to Dominguez— but American Safety maintains that the City never should have allowed its lawyer to agree to indemnify Hendley and that it cannot be responsible for payments the City made voluntarily; the policy covers Waukegan's legal obligations but not gratuitous outlays.

It comes with ill grace for an insurer that steadfastly refused to defend its customer to insist that it is relieved of liability because the insured erred in conducting a defense that was thrust upon it. The City maintains that it did not blunder, because its concession in the suit was compelled by Illinois law. The district court held that the City is right about this (776 F. Supp. 2d at 700–01), and in this court American Safety has ignored the ground on which the district judge ruled against it. But the whole to-and-fro puzzles us. Hendley was himself an insured under the policy, which covers the City *and* its law-enforcement personnel. American Safety must indemnify Hendley. It makes no difference whether it pays Dominguez directly (on behalf of Hendley) or indi-

rectly (by reimbursing the City, which paid Dominguez on behalf of Hendley).

Part of what Waukegan paid Dominguez on behalf of Hendley represents attorneys' fees awarded in Dominguez's favor under 42 U.S.C. §1988(b). American Safety apparently recognizes that attorneys' fees under §1988 are treated as costs rather than damages but contends that, because the City paid these fees as part of its obligation to indemnify Hendley, they turned into damages and are excluded, because Dominguez received more than $1 million (the policy limit) in compensatory damages. This sounds like a dispute between American Safety and Interstate Indemnity (the excess carrier) about which of them is responsible for what part of the judgment, yet American Safety did not appeal against Interstate Indemnity. Waukegan does not care which carrier covers this expense; it is entitled to payment from one of the insurers. That American Safety is trying to eliminate part of the compensation needed to make Waukegan whole is yet another mark of a vexatious litigation strategy.

At all events, this line of argument fails for a reason we have already mentioned: the policy covers Hendley as one of Waukegan's law-enforcement employees. From Hendley's perspective, Dominguez's attorneys' fees are "costs" under §1988. Cf. *Yang v. Chicago*, 195 Ill. 2d 96 (2001) (treating an award of attorneys' fees to a prevailing plaintiff under §1988 as costs rather than damages for the purpose of a state statute). Doubtless a policy could be written to count a prevailing plaintiff's

attorneys' fees toward a cap on the insurer's total outlay, just as a policy could count defense expenses against the limit, but the actual policy does not treat either defense expenses or costs as "damages" to which the $1 million limit applies.

Finally we have an appeal by Waukegan against Scottsdale, whose policy does not cover any of the liability. Scottsdale's policy did cover Dominguez's false-arrest claim, but that claim was dismissed as untimely. The district court entered judgment in Scottsdale's favor. Waukegan contends, however, that Scottsdale is estopped to assert any policy defense (such as non-coverage) because it neither offered to defend the City nor filed a declaratory-judgment action until after the jury had returned its verdict for Dominguez, and that for the same reason Scottsdale is liable under §155.

Because the judgment in the City's favor against American Safety and Interstate Indemnity appears to make Waukegan whole, its appeal may be unimportant. But just in case we have missed something, we add that the district court's dismissal of the City's claim against Scottsdale, see 2009 U.S. Dist. LEXIS 25742 (N.D. Ill. Mar. 30, 2009), is entirely justified. The policy Waukegan purchased from Scottsdale required the City to notify the insurer "immediately" after a claim was made. It took the City more than two years, however, to find the policy and notify the insurer. Scottsdale did not learn about the litigation until September 27, 2006, just six days (four business days) before the trial began, and three weeks before the jury returned its verdict. Scottsdale

filed its declaratory-judgment action on January 5, 2007, acting much quicker than the City (or any of the insurers notified in 2004) had done. Scottsdale's delay cannot be seen as unreasonable or vexatious.

Nonetheless, Waukegan contends, an insurer is forbidden to stand on the terms of its policy—and must pay damages under §155—if for any reason it does not assume the defense at trial or get a declaratory-judgment action on file by the trial's end. On this understanding, if the City had withheld notice until the day after the jury's verdict, then Scottsdale automatically would be liable. That can't possibly be the law in Illinois or anywhere else; it would induce clients to play games with their insurers and, by vitiating every policy's terms, make insurance impossibly expensive (if the market did not collapse outright).

Waukegan says that *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127 (1999), supports its position, no matter how implausible it seems and no matter how destructive it would be to insurance markets. Illinois requires an insurer that denies coverage either to defend under a reservation of rights or to seek a declaratory judgment of non-coverage; if it takes neither step while the underlying litigation proceeds, it is estopped to deny coverage. See, e.g., *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 207–08 (1991). *Ehlco* extends this doctrine to defenses based on late notice. If an insurer believes that its client's violation of the policy's notice requirement relieves it of the duty to defend or indemnify, the

insurer must nonetheless defend (under a reservation of rights) or seek a declaratory judgment; if it abandons its client without doing one of these things, it loses the benefit of the late-notice defense. 186 Ill. 2d at 154.

Waukegan gave Scottsdale a notice—years late, to be sure, but notice nonetheless. Scottsdale did not defend Dominguez's suit or seek a declaratory judgment before it reached judgment. As Waukegan sees things, *Ehlco* blocks Scottsdale from urging *any* defense—not only late notice, but also the fact that the policies Scottsdale issued for 1989 and 1990 simply don't apply, given that Dominguez was not exonerated until 2002. Scottsdale responds that *Ehlco* supposes that the insurer had enough notice to act. In *Ehlco* the insurer waited 11 years after being notified by its client. The underlying suit (by the EPA) involved liability for the costs of environmental cleanup. Ehlco notified the carrier about the dispute in 1982; the EPA did not sue until 1988; the insurer declined to defend its client and did not seek a declaratory judgment until 1993, about nine months after the suit was settled. When the insurer did seek a declaratory judgment, its only argument was that the client should have given notice in 1978, when it learned about the contamination, rather than in 1982, when it learned that the EPA might demand a costly cleanup. That's the defense that the Supreme Court of Illinois held foreclosed by the insurer's delay (coupled with its refusal to defend its client against the EPA's claims).

The district court agreed with Scottsdale that *Ehlco*'s understanding of estoppel applies only when the insurer

has enough time to assess the nature of the underlying suit, compare the plaintiff's allegations against the policy's terms, and research the governing law so that it can intelligently evaluate the client's request for a defense. In Illinois estoppel is a penalty designed to induce insurers to protect clients who are at risk, rather than to sit idly while the underlying suit proceeds. The estoppel doctrine, like the penalty provisions of §155, is supposed to discourage unreasonable and vexatious conduct. Yet Scottsdale did not behave unreasonably; it takes more than four days (which is all the time Scottsdale had) to hire a law firm, analyze the complaint in light of the policy, research the applicable law, obtain the approval of responsible claims supervisors, and get a declaratory-judgment suit under way. Insurance companies have multiple layers of review; bureaucracies need time to act.

The intermediate appellate courts of Illinois have concluded that *Ehlco* does not block an insurer from contending that it had *so* little time that, even acting diligently, it could not have supplied a defense or commenced a suit for a declaratory judgment before the underlying litigation reached judgment. See, e.g., *State Automobile Mutual Insurance Co. v. Kingsport Development, LLC*, 364 Ill. App. 3d 946, 960 (2006) (insurer entitled to a "reasonable time" in which to decide and act); *Northern Insurance Co. of New York v. Chicago*, 325 Ill. App. 3d 1086, 1095 (2001) (no duty to defend, and no estoppel, if the client does not give the insurer "an opportunity to participate" in the underlying suit). Waukegan asks us to reject these decisions, but the Supreme Court of

Illinois has left them in place. We think it unlikely that the state's highest court would agree with Waukegan's understanding of *Ehlco*.

The City also contends that Scottsdale could have secured more time by asking the district judge to postpone the trial. That contention is more than a little odd; Waukegan was running its own defense, and *it* could have asked for a delay if the City wanted to provide Scottsdale with time to analyze the situation. The district judge was unlikely to treat the City's own failure to comply with its notice obligation as a good reason to postpone, indefinitely, a jury trial less than a week away. Time had been reserved on the judge's schedule; witnesses had been notified and had rearranged their own lives in order to testify. Last-minute delays in complex litigation are seldom appropriate. Scottsdale acted with all the dispatch Waukegan had any right to expect; the district judge sensibly held that Scottsdale cannot be liable for either defense or indemnity expenses in the Dominguez litigation.

AFFIRMED