In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 11-1215 & 11-3729

NORTHFIELD INSURANCE COMPANY and
ST. PAUL FIRE & MARINE INSURANCE COMPANY,

*Plaintiffs-Appellees,*

*v.*

CITY OF WAUKEGAN, *et al.*,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 7402—**Charles R. Norgle**, *Judge.*

ARGUED MAY 24, 2012—DECIDED NOVEMBER 21, 2012

Before CUDAHY, KANNE, and HAMILTON, *Circuit Judges*.

KANNE, *Circuit Judge.* Northfield Insurance Company and St. Paul Fire & Marine Insurance Company (collectively, the "insurers") provided law enforcement liability coverage to the city of Waukegan, Illinois, and its employees acting within the scope of employment. In 2009, Bennie Starks filed a civil rights suit against the city and a handful of current and former Waukegan police

officers, among others, alleging that each played a role in his decades-old wrongful conviction. In response, the insurers filed an eight-count declaratory judgment action seeking a declaration that they have no duty to defend or indemnify the city or employees. The district court granted summary judgment in favor of the insurers, reasoning that the disputed insurance policies did not cover the city at the time of the alleged wrongdoing. We affirm.

## I. BACKGROUND

The underlying facts are undisputed. Northfield Insurance Company issued two comprehensive general liability policies to Waukegan, effective November 1, 1991, to November 1, 1995.[1] The two Northfield policies at issue contained a law enforcement liability provision, which provided that the insurer would cover all sums for which the city "shall be obligated to pay by reason of errors, omissions or negligent acts arising out of the performance of the Assured's duties while acting as a law enforcement official or officer in the regular course of public employment." From November 1, 2006, to November 1, 2009, the city maintained a similar policy with St. Paul Fire & Marine Insurance Company. Like the Northfield policy, the St. Paul Fire policy contained a law enforcement liability provision which provided

---

[1] Northfield issued a third policy covering November 1, 1995, to November 1, 1997, but the parties agree that this policy is not at issue.

coverage for "wrongful act[s] . . . committed while conducting law enforcement activities or operations." Both policies covered the city on an "occurrence basis." And, the policies defined "occurrence" and "personal injury" to include false arrest, false imprisonment, malicious prosecution, and other civil rights violations. Both insurers also provided coverage to the city's officers and officials acting within the scope of their employment. Evidently, other insurance carriers provided coverage during the intervening years, and those carriers' duties to defend are being litigated in at least two separate declaratory judgment actions.

In January 2009, Bennie Starks filed the underlying civil suit, which the city quickly tendered to Northfield and St. Paul Fire for a defense. Broadly speaking, Starks alleges that the city and several police officers, among others, unlawfully conspired to convict him of crimes he did not commit. In his complaint, Starks primarily seeks damages for false arrest and imprisonment, wrongful conviction, denial of due process, and malicious prosecution. The background of his suit is as follows. In January 1986, a woman reported to the Waukegan police that she had been attacked and raped. Officers quickly arrested Starks, who was then charged and convicted of three counts of sexual assault. Twenty years into his sixty-year sentence, newly surfaced DNA evidence raised serious doubts about his guilt, and on March 23, 2006, the Illinois Appellate Court reversed Starks's conviction and ordered a new trial. On January 20, 2007, the Illinois Appellate Court issued the related mandate returning jurisdiction to the trial

court. At the time Starks's conviction was overturned, state prosecutors moved to re-prosecute him. But on May 15, 2012, one week before oral argument in this appeal, the state trial court entered a *nolle prosequi* order effectively terminating any further criminal proceedings against him.[2]

On November 25, 2009, Northfield and St. Paul Fire filed an eight-count declaratory judgment action, 28 U.S.C. § 2201, seeking a declaration that it has no duty to defend or indemnify the appellants for the claims made in Starks's suit. The action was initially docketed with Judge Coar. In June 2010, the district court denied the appellants' motion to stay the proceedings pending resolution of Starks's criminal case, and in December 2010, it entered summary judgment in favor of the insurers. The appellants filed a timely appeal of both decisions, which we docketed as 11-1215. On appeal, we issued a limited remand so the district court could clearly spell out the terms of the declaratory relief. *Northfield Ins. Co. v. City of Waukegan*, No. 11-1215, slip op. (7th

---

[2] On the eve of oral argument, the insurers asked us to strike the appellants' motion to cite supplemental authority, which included a citation to and analysis of the trial court's *nolle prosequi* order. The insurers argue that the appellants' motion was supplemental evidence that was not before the district court rather than supplemental authority. Semantics aside, we take judicial notice of the trial court's order and deny the insurers' motion to strike. *See In re Salem*, 465 F.3d 767, 771 (7th Cir. 2006) (taking judicial notice of state-court dockets and opinions).

Cir. Aug. 23, 2011). In the interim, Judge Coar retired, and the case was reassigned to Judge Norgle, who promptly entered a Rule 58(a) judgment in favor of the insurers. The appellants filed a timely appeal of that ruling, which we docketed as 11-3729. On December 13, 2011, we consolidated the two appeals for purposes of briefing and disposition.

## II. ANALYSIS

On appeal, the appellants argue the district court erred by (1) granting summary judgment in favor of the insurers; (2) denying their motion to stay the declaratory judgment action pending resolution of Starks's criminal proceeding; and (3) granting overbroad declaratory relief. We take each argument individually.

### A. Summary Judgment

We review grants of summary judgment *de novo*, viewing the record in the light most favorable to the appellants and drawing all reasonable inferences in their favor. *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The question before us is whether the allegations in Starks's complaint trigger Northfield's or St. Paul Fire's duty to defend. To answer that question, we look to

Illinois law, which the parties agree governs this dispute. *Nat'l Cas. Co. v. McFatridge*, 604 F.3d 335, 338 (7th Cir. 2010). Under Illinois law, we compare the allegations in Starks's complaint with the express language in the insurance policy to determine whether an insurer's duty to defend has been triggered. *Gen. Agents Ins. Co. of Am., v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1098 (Ill. 2005). "If the underlying complaint alleges facts within or potentially within policy coverage, an insurer is obligated to defend its insured even if the allegations are groundless, false or fraudulent." *Id.*; *accord CMK Dev. Corp. v. W. Bend Mut. Ins. Co.*, 917 N.E.2d 1155, 1163 (Ill. App. Ct. 2009) (holding the duty to defend is "much broader" than the duty to indemnify). An insurer may justifiably refuse to defend the insured only if "it is *clear* from the face of the underlying complaint[ ] that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage." *U.S. Fid. & Guar. Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 930 (Ill. 1991); *accord Lagestee-Mulder, Inc. v. Consol. Ins. Co.*, 682 F.3d 1054, 1056 (7th Cir. 2012). One such instance where an insurer can justifiably refuse coverage is when the underlying allegations accrue outside of the relevant policy period. *Am. Safety Cas. Ins. Co. v. City of Waukegan, Ill.*, 678 F.3d 475, 477-79 (7th Cir. 2012); *McFatridge*, 604 F.3d at 344. Here, the insurers have no duty to defend if Starks's allegations occurred outside of the policy periods.

With that in mind, we turn to Starks's complaint, which we liberally construe in favor of the appellants. *Wilkin Insulation Co.*, 578 N.E.2d at 930. Paragraph thirty-nine

of the complaint perhaps best summarizes Starks's claims. There, he alleges that he was deprived of "his rights to be free from unreasonable arrest and seizure, from wrongful confinement and imprisonment, and his rights to access to the Courts and to a fair and impartial trial, as protected by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments." (Starks Compl. at 6-7.) From that, we infer that Starks is asserting claims for malicious prosecution, wrongful conviction, denial of due process, and false arrest and imprisonment, the last of which is an overlapping theory of relief, *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Starks's complaint also suggests that he intends to bring an intentional infliction of emotional distress (IIED) claim once the criminal prosecution against him terminates. (Starks Compl. at 12 n.3.) Because we can imagine an IIED claim *potentially* falling within the policy terms, we will assume that Starks fully intends to submit such a claim. *See Wilkin Insulation Co.*, 578 N.E.2d at 930 (insurer must defend all claims potentially within coverage).

We pause momentarily to reject the appellants' suggestion that Starks could have or plans to assert claims for some unknown torts grounded in the First and Eighth Amendments. Potential theories of recovery might include a deprivation of his freedom of speech or religion or some type of deliberate indifference claim under the Eighth Amendment. The appellants argue that because Starks referenced the First and Eighth Amendments without specifying theories of relief, we should wait to definitively determine whether the insurers have a duty to defend until Starks has fully outlined

his claims. Although we acknowledge that "the duty to defend does not require that the complaint allege or use language affirmatively bringing the claims within the scope of the policy," *Am. Econ. Ins. Co. v. Holabird & Root*, 886 N.E.2d 1166, 1171 (Ill. App. Ct. 2008), we will not cobble together a more compelling or comprehensive complaint than what is written or what can be inferred. After all, we are charged with comparing the underlying complaint, inferences, and other known facts to the insurance policy, not some hypothetical or hoped-for version. *Conn. Indem. Co. v. DER Travel Serv., Inc.*, 328 F.3d 347, 350-51 (7th Cir. 2003) (stating "it is the actual complaint, not some hypothetical version, that must be considered"). Here, there are no supporting allegations even hinting at a First or Eighth Amendment claim. Starks never alleges that his right to free speech or religion was suppressed, nor does he allege that he was subjected to cruel or unusual punishment or any type of deliberate indifference. Moreover, it is difficult to imagine a scenario where the city and its police officers are responsible for these types of offenses rather than state-prison authorities. Ultimately, nothing in the complaint or any generous inference we may grant the appellants suggests that Starks has a claim under the First or Eighth Amendments.

We now turn to the three discrete allegations Starks makes in his complaint. We analyze each individually to determine whether there is a duty to defend.

*1. False Arrest and Imprisonment*

Starks first alleges that he was falsely arrested and imprisoned for a crime he did not commit. We need not spend much time discussing the insurers' duty to defend these claims because *McFatridge* and *American Safety* are directly on point. Generally, Starks's false arrest and imprisonment claims imply that he was detained without legal process. *Wallace*, 549 U.S. at 389. As such, "[t]he false imprisonment ends, and the claim accrues when he is held pursuant to a warrant or other judicially issued process." *McFatridge*, 604 F.3d at 344. Here, Starks was arrested (presumably subject to an arrest warrant, although the record on this point is unclear) and duly convicted in 1986. To the extent Starks's complaint makes out a false arrest and imprisonment claim, that offense accrued sometime in 1986 prior to his conviction. *See id.* Because neither the Northfield nor the St. Paul Fire policies were in effect in 1986, the insurers have no duty to defend against these claims.

*2. Malicious Prosecution, Wrongful Conviction, and Denial of Due Process*

Starks next alleges that he was the victim of malicious prosecution, wrongful prosecution, and a denial of due process, all of which contest the fairness of his prosecution. *See Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009). To succeed on such claims, Starks must prove that he was exonerated; until then, he has no claim. *Am. Safety*, 678 F.3d at 478. With that in mind, we held in

*McFatridge* and *American Safety* that the trigger date
for a malicious prosecution claim occurs on the day of
exoneration. *See Am. Safety*, 678 F.3d at 478 ("[U]nder
Illinois law, the issuer of the policy in force on the date a
convict is exonerated must defend and indemnify an
insured whose law-enforcement personnel violate the
Constitution (or state law) in the process of securing a
criminal conviction.").

   Here, the district court was presented with a com-
plaint that contains slight inconsistencies as to the date
of exoneration. Starks initially alleges that the Illinois
Appellate Court reversed his conviction on March 23,
2006, (Starks Compl. at 5), although that court did not
issue the related mandate returning jurisdiction to the
trial court until January 20, 2007. (*Id.* at 6). Momentarily
ignoring the importance of either date, both of these
allegations imply that Starks was fully exonerated fol-
lowing action by the Illinois Appellate Court. Alterna-
tively, the complaint alleges that the state's attorney
sought to re-prosecute Starks even after the Illinois Ap-
pellate Court overturned his conviction. (*Id.* at 6; n.1.)
This allegation, of course, suggests that neither action
by the Illinois Appellate Court exonerated Starks,
which means that his malicious prosecution claim
has not yet ripened. *See Am. Safety*, 678 F.3d at 478.
Notwithstanding that inconsistency, we can definitively
say that Starks's malicious prosecution (and related)
allegations do not trigger the two Northfield policies in
effect from November 1, 1991, to November 1, 1995.
Because Starks was not exonerated during that policy
period, Northfield has no duty to defend his malicious
prosecution claims.

That leaves us with the St. Paul Fire policy, effective November 1, 2006, to November 1, 2009. Because we are charged with liberally construing the complaint and policy in favor of the appellants, we will evaluate the two divergent lines of allegations in Starks's complaint, while granting all reasonable inferences to the appellants. We take the easy strain first and assume as true the allegation that Starks has not yet been exonerated. If true, then Starks's claim for malicious prosecution has not ripened. In other words, Starks was not exonerated during St. Paul Fire's policy period, and thus, the insurer has no duty to defend in this scenario. The other line of allegations suggests that Starks was fully exonerated once the Illinois Appellate Court vacated his conviction. If true, the question for us is which date applies: the date of the reversal or the date of the mandate. This is also a relatively easy question because the law in Illinois clearly provides that the effective date of an Illinois Appellate Court decision is the date of judgment, not the date the mandate was issued. *PSL Realty Co. v. Granite Inv. Co.*, 427 N.E.2d 563, 570 (Ill. 1981) ("The date of the issuance of the mandate does not control the effective date of the appellate court judgment."); *Hickey v. Riera*, 774 N.E.2d 1, 10 (Ill. App. Ct. 2001). Thus, even if we were to read the complaint to suggest that Starks was fully exonerated, the effective date of that exoneration is March 23, 2006, which falls outside of St. Paul Fire's coverage.

This is not the end of the discussion, however. One week before oral argument in this appeal, the state trial court issued a *nolle prosequi* order in Starks's criminal

case, which effectively terminated any further prosecution against him. At oral argument, the appellants argued that the *nolle prosequi* is not a final disposition, and instead, it is a procedure that reverts the matter back to the same condition that existed before the commencement of the prosecution. In other words, the appellants read the *nolle prosequi* order as reverting the date of exoneration back to January 20, 2007, the date the mandate was issued. We have already rejected the notion that the mandate is the effective date of disposition and thus, exoneration. But even if that were not the case, the appellants have mischaracterized the effect of a *nolle prosequi*. For civil malicious prosecution matters in Illinois, "a criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a *nolle prosequi*, unless the abandonment is for reasons not indicative of the innocence of the accused." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242-43 (Ill. 1996). The *Swick* rule leaves two possibilities for Starks and the appellants. If the prosecution was abandoned for reasons of Starks's innocence, then May 15, 2012, is the trigger date for his malicious prosecution claim. On the other hand, if the prosecutors dropped Starks's case for some reason not indicative of innocence—such as the unavailability of a key witness—then the *nolle prosequi* order would not have terminated the prosecution in Starks's favor, leaving Starks yet to be exonerated. We need not decide whether the *nolle prosequi* order in this case is indicative of innocence because in either scenario, the malicious prosecution occurrence falls outside of St. Paul Fire's policy.

We must address one more issue before examining Starks's final allegation. Specifically, the insurers invite us to reconsider our holdings in *McFatridge* and *American Safety* by asserting that those cases interpreting Illinois law contradict the vast majority of other jurisdictions. As we have already recounted, those cases hold that the trigger date for a malicious prosecution claim in Illinois is the date of exoneration. *See Am. Safety*, 678 F.3d at 478; *McFatridge*, 604 F.3d at 344. But the overwhelming majority of jurisdictions to address this issue consider the trigger date to be the date of the underlying criminal charges or conviction. *Am. Safety*, 678 F.3d at 479 (collecting cases). Although we acknowledge Illinois's minority status, we have recently found that the one Illinois Appellate Court opinion on point plainly holds that the trigger date for a malicious prosecution claim is the date of exoneration. *Id.* at 478-79 (*citing Sec. Mut. Cas. Co. v. Harbor Ins. Co.*, 382 N.E.2d 1 (Ill. App. Ct. 1978), *rev'd on other grounds*, 397 N.E.2d 839 (Ill. 1979)). As a federal court interpreting Illinois law, we are not entitled to singlehandedly modify the Illinois rule without some new direction from the state. Moreover, we fully analyzed the Illinois rule and the majority rule in *American Safety* not more than a few months ago, and we see no need to repeat that discussion here. Suffice it to say, we decline to disrupt our own precedent or that of the Illinois Appellate Court, *see Blood v. VH-1 Music First*, 668 F.3d 543, 546 (7th Cir. 2012) (permitting federal courts to give "proper regard" to the state's lower courts). Accordingly, we apply the Illinois trigger rule for civil claims of malicious prosecution.

*3.  Intentional Infliction of Emotional Distress*

Finally, Starks suggests that he plans to bring an IIED claim if and when he is fully exonerated. Because Illinois requires an insurer to defend all claims that are potentially within coverage, *Wilkin Insulation Co.*, 578 N.E.2d at 930, we assume that Starks will eventually bring this claim. That said, we must examine a potential IIED claim to determine whether it occurred during the policy periods.

Generally, "the final element of the tort marks the occurrence" or trigger date, *Am. Safety*, 678 F.3d at 480, and IIED claims are no different. But here, the appellants change course and argue that the injuries stemming from the IIED are continuous, and thus, we should apply a continuous trigger to that potential claim. *See Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 190 (Ill. 2002) ("[W]here a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease."). Thus, under the appellants' continuous-trigger theory, any injuries Starks suffered from the IIED potentially trigger both Northfield's and St. Paul Fire's policies. We disagree.

The appellants conflate continuing harmful acts with the continuing effects of one harmful act. "A continuing violation or tort is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 85 (Ill. 2003). To differentiate these concepts, Illinois courts must determine whether a "single overt act" is the cause

of subsequent damages or whether the accused continually perpetrated harmful acts. *Id.*

In this case, Starks's complaint alleges potentially outrageous conduct committed by prosecutors, police officers, and crime-lab technicians, during his 1986 trial and the preparation for that trial. The complaint does not allege that Starks faced outrageous conduct at any other time. Accordingly, whether it is ultimately determined that Starks' IIED claim accrued when he was indicted or when he was exonerated, his claim still occurred outside the scope of both Northfield's and St. Paul Fire's policies, and neither insurer is liable. *Compare Brooks*, 578 F.3d at 579 (Illinois IIED claim based on allegations related to fairness of prosecution accrued when plaintiff was indicted, not when he was acquitted), *with Parish v. City of Elkhart*, 614 F.3d 677, 683-84 (7th Cir. 2010) (under Indiana law, IIED claim was not completed prior to conviction and would have impugned plaintiffs' conviction under *Heck v Humphrey*, 512 U.S. 477 (1994), so claim accrued upon plaintiff's exoneration), *and Lieberman v. Liberty Healthcare Corp.*, 948 N.E.2d 1100, 1107-08 (Ill. App. Ct. 2011) (under Illinois law, rule of *Heck v. Humphrey* applies to claims for medical or legal malpractice that directly attack legality of plaintiff's confinement).

## B.  Motion to Stay Proceedings

The appellants next claim that the district court erred by refusing to stay the declaratory judgment proceedings until Starks's criminal case ended. The Declara-

tory Judgment Act by its own terms grants district courts discretion in determining whether to entertain such an action. 28 U.S.C. § 2201(a) (providing that the district court "*may* declare the rights and other legal relations of any interested party seeking such declaration" (emphasis added)). Naturally, we review a denial to stay proceedings for an abuse of discretion. *See Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983, 985-86 (7th Cir. 2010) ("[A] district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment."). Here, the appellants make a handful of arguments faulting the district court for refusing to grant its motion to stay proceedings, none of which we find persuasive.

Principally, the appellants claim that there are too many uncertain future events to allow the district court to effectively adjudicate the insurers' obligations. But, as our preceding analysis of Starks's complaint suggests, we disagree. The complaint sets forth specific claims for false arrest and imprisonment and the various claims for malicious prosecution. Starks also intimates that he intends to bring an IIED claim. All of those claims have discrete trigger points that allowed the district court to determine whether the insurers have a duty to defend. And no future actions, save Starks's exoneration—which brings his claim even farther outside of the insurers' policies—change that analysis. Any delay in adjudicating the insurers' duty to defend costs the insurers much-needed certainty. *See Am. Safety*, 678 F.3d at 480 (A long tail of insurance coverage affects insurers' ability to adjust prices to reflect previously

incurred risk.). Thus, we find that the district court rightly exercised its discretion in denying the appellants' motion to stay.

The appellants also point out that they sent the insurers a letter proposing that the parties file a joint motion to stay proceedings. Apparently, this letter is evidence of the appellants' willingness to back away from their immediate demand for coverage and a defense. And without a demand for coverage, the district court has no live controversy to adjudicate. The appellants have mischaracterized the contents of the letter. In fact, this letter never suggests that the appellants intend to withdraw their demand for coverage. Rather, the letter simply requested that both parties file a joint motion to stay the proceedings. As long as a live controversy exists between the parties, the district court has discretion to declare the rights of the parties. 28 U.S.C. § 2201(a); *see also Cincinnati Cos. v. W. Am. Ins. Co.*, 701 N.E.2d 499, 504 (Ill. 1998) ("If, after being contacted, the insured indicates that it desires the insurer's assistance, then the insurer's duty to defend continues.").

Finally, the appellants argue that the district court must have abused its discretion because two other courts facing the same underlying civil complaint stayed proceedings pending the resolution of Starks's criminal case. At the threshold, we have already acknowledged that district courts have wide discretion in adjudicating declaratory judgment actions and motions to stay proceedings. It is no surprise that district judges vested with this discretion may come to different conclusions.

More than that, the two cases the appellants cite are inapposite. For example, Judge Kocoras granted a stay in *TIG Ins. Co. v. City of Waukegan*, No. 10-cv-1466 (N.D. Ill. Apr. 28, 2010), presumably because TIG Insurance was on risk from November 1, 1985, to November 1, 1987. Our preceding trigger analysis suggests that Starks's claim for false imprisonment may have ripened in 1986, potentially implicating TIG's duty to defend. Similarly, Judge Gettleman stayed the proceedings in *Westport Ins. Co. v. City of Waukegan*, No. 10-cv-263 (N.D. Ill. Apr. 28, 2010). Unlike this case, the insurer there was on risk under numerous policies stretching from November 1, 1987, to November 1, 2000. Given the greater complexity, it again is no surprise that the district court in that case exercised its discretion to stay the proceedings. The larger point, however, is that district courts maintain wide discretion in adjudicating these matters, and evidence of conflicting decisions without anything more is not evidence that a judge abused that discretion. In sum, we find that the district court was well within its discretion in denying the appellants' motion to stay.

## C. *Declaratory Relief*

Finally, the appellants claim that Judge Norgle's declaratory relief order is overbroad because it supposedly preempts "any and all insurance coverage." In other words, the appellants claim that Judge Norgle's order prohibits *all* future claims that may have arisen during the policy period, not just those in Starks's complaint. This argument misunderstands Judge Norgle's order.

In his order for declaratory relief, Judge Norlge plainly states, "Plaintiffs . . . owe no duty to defend or indemnify Defendants . . . concerning claims made against them in the case of *Starks v. City of Waukegan*, No. 09-CV-348 (N.D. Ill. filed Jan. 20, 2009)." Instead of limiting all potential claims, as the appellants suggest, Judge Norgle's order simply precludes coverage of the claims Starks made in his 2009 civil suit.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of Northfield and St. Paul Fire.

HAMILTON, *Circuit Judge*, concurring. I join the court's opinion, which accurately applies the available precedents of our court and the Illinois courts to the questions before us. I write separately to make two observations: one on the handling of the Starks case in particular and another on the handling of wrongful conviction claims in general.

First, we have been told that two additional cases are pending in the Northern District of Illinois concerning

the City of Waukegan's liability insurance coverage
for the wrongful conviction claims asserted by Bennie
Starks. The other cases involve other insurers with
policies covering different time periods going back more
than twenty years. The cases have been stayed pending
progress in Starks' criminal case, but that case is now
resolved and presumably the stays will soon be lifted.
For the reasons explained in Judge Kanne's opinion for
the court, I am confident that the two insurers in this
case are not required to defend or indemnify the city
against these claims. As long as the city has kept
liability insurance in place over the decades, though, it
is highly likely that the city is entitled to a defense and
indemnity from at least one insurer, perhaps from more
than one.

I respect the district court's broad discretion in man-
aging related cases, but keeping separate these cases
contesting insurance coverage for the very same under-
lying claims seems to be an invitation for duplicative
litigation and inconsistent results. The city is in a posi-
tion that is the mirror image of an interpleader plain-
tiff — rather than having money or property that it
knows it should pay to someone in a group of com-
peting claimants, the city knows that it should be paid
by someone among the various insurers. The insurers
should resolve the coverage issues among themselves.
If and when the stayed cases come back to life, I hope
the district judges will reconsider whether they should
remain separate.

Second, at a more general level, I note the complexity
and confusion of the related timing questions — questions

including ripeness, statutes of limitations, and insurance coverage — that are necessarily raised by the claims brought by people like Starks who are wrongfully convicted and spend years in prison. Issues relating to timing usually focus on either the beginning of the criminal process or the end. Was the claim ripe and did the statute-of-limitations clock begin to run at the time of the wrongful conviction and related events? Or was the claim ripe and did the statute-of-limitations clock begin to run only when the wrongful conviction was set aside?

With either answer, there can be a devil in the details. If the focus is on the beginning of the process, do we focus on the date of wrongful conduct by law enforcement, the date of conviction, the date of affirmance on direct appeal, or other events? (Anyone who wants to see how tricky even the last two possibilities can be should study the extensive federal case law on when the one-year clock for filing a federal habeas corpus petition runs under 28 U.S.C. § 2244(d). See, *e.g.*, *Evans v. Chavis*, 546 U.S. 189 (2006); *Carey v. Saffold*, 536 U.S. 214 (2002).) If the focus is on the exoneration end of the process, do we focus on the date that a conviction is first vacated, the date that a court issues its mandate, or, in case of a remand or writ of habeas corpus allowing a new trial, when the reopened proceedings are concluded in favor of the accused?

There is plenty of room for confusion and mutual inconsistency in the ways courts handle these different timing issues in these wrongful conviction cases, not to mention malleability of arguments and outcomes. In

any particular case, current Illinois law allows capable counsel to make arguments to justify nearly any resolution that would benefit their client — whether the client is the wrongfully convicted plaintiff, the government, or the insurer. Only the Illinois courts can untangle these knots to provide justice, consistency, and predictability. For example, the city here suggested at oral argument that the statute of limitations might have run on Starks' claims before he could even bring them. The convoluted theory seems to be that Starks was actually exonerated back in 2007 when the Illinois Appellate Court issued its mandate, but that his claims did not accrue until the criminal prosecution ended with the 2012 *nolle prosequi*. Under this theory, the 2012 *nolle prosequi* somehow retroactively started the statute-of-limitations clock running back in 2007, effectively barring Starks' claims before they accrued and could be brought. The fact that such an argument could be made with a straight face is a symptom of a need for clarification of Illinois law on these timing issues.

The argument also highlights a related point — the challenge of figuring out the scope of an insurer's duty to defend claims in which the plaintiffs and defendants in the underlying claims try to cope with the uncertainty. Even if the plaintiff in the underlying case brings a claim that is clearly not yet ripe or is clearly barred by the statute of limitations, an insurer may still have a duty to defend its insured against the claim. See *Valley Forge Ins. Co. v. Swiderski Electronics, Inc.*, 860 N.E.2d 307, 315 (Ill. 2006) (insurer is obligated to defend "even if the allegations are groundless, false, or fraudulent, and even if only one of several theories of recovery alleged in

the complaint falls within the potential coverage of the policy").

The choice between imposing the duty to defend on the insurer at the time of the original prosecution and conviction and the insurer at the time of the later exoneration is a difficult one. In *National Casualty Co. v. McFatridge*, 604 F.3d 335 (7th Cir. 2010), and *American Safety Casualty Ins. Co. v. City of Waukegan*, 678 F.3d 475 (7th Cir. 2012), we held that the trigger date for a malicious prosecution claim under Illinois law was the day of exoneration. (This case shows that "exoneration" can be a rather slippery concept, but I will leave those nuances aside for now.) If the trigger date is the original conviction, then the insurer from that time faces a decades-long liability "tail." If the trigger date is the day of final official exoneration, then insurability can become a serious problem because of the prospect of a "known loss." The city seeking insurance may be able to see looming liability well in advance, and an insurer may be able to demand disclosures about pending cases. Suppose the City of Waukegan tried to buy liability insurance for the Starks case after the DNA tests that led to Starks' exoneration, or even after the March 23, 2006 appellate opinion had been issued. See *People v. Starks*, 850 N.E.2d 206, 211 (Ill. App. 2006). Under *McFatridge* and *American Safety*, insurers from earlier periods probably would be off the hook. But if there were full disclosure of relevant facts after the DNA test or the appellate opinion, then insurance for a case like the Starks case could be prohibitively expensive and essentially not available at all.

The insurers here have invited us to reconsider *McFatridge* and *National Casualty*. There are good reasons why we should not. Our opinions in those cases are consistent with the relevant Illinois precedent, and this is a question of state law. If the rule we adopted in those cases needs to be reconsidered, it should be done by the Illinois courts. If the Illinois courts do reconsider, I hope they will do so with an eye toward the full range of issues that can arise in these cases, including *Heck v. Humphrey*, 512 U.S. 477 (1994), and Illinois's embrace of that rule in *Lieberman v. Liberty Healthcare Corp.*, 948 N.E.2d 1100, 1107-08 (Ill. App. 2011), as well as ripeness, statutes of limitations, and the insurance coverage issues.