GEORGE H. BILLINGS *vs.* COMMERCE INSURANCE COMPANY.

Barnstable. September 13, 2010. - November 4, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Insurance,* Insurer's obligation to defend, Construction of policy, Coverage.
*Contract,* Insurance. *Malicious Prosecution. Libel and Slander. Emotional
Distress. Words,* "Occurrence," "Personal injury."

This court concluded that, under the terms of a personal umbrella liability
insurance policy (policy) that the defendant insurer issued to the plaintiff,
the defendant owed the plaintiff no duty to defend him in an action for
malicious prosecution and intentional infliction of emotional distress,
where, for purposes of the claim of malicious prosecution, the "occur-
rence" under the policy was the filing of the underlying allegedly mali-
cious action before coverage under the policy began, not the termination of
that action during the coverage period [196-200]; and where, although in
the circumstances of the case the allegations in the claim for intentional
infliction of emotional distress were reasonably susceptible of an interpreta-
tion that roughly sketched a claim for libel, slander, or defamation that
could be covered under the policy, the allegations were not reasonably
susceptible of an interpretation that any defamatory statement occurred
during the policy period [200-205].

CIVIL ACTION commenced in the Superior Court Department on
January 26, 2006.

The case was heard by *Regina L. Quinlan,* J., on motions for
summary judgment.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Thomas C. Kenny* for the plaintiff.

*John F. Hurley, Jr.,* for the defendant.

*John Murphy,* for American Insurance Association, amicus
curiae, submitted a brief.

GANTS, J. For the period from March 15, 2000, through March
15, 2001, the defendant, Commerce Insurance Company (Com-
merce), insured the plaintiff, George H. Billings (Billings),
under a personal umbrella liability policy (policy). The policy

provided that, if a suit was brought against Billings for damages because of "personal injury" caused by "an 'occurrence' to which this policy applies," Commerce would provide a defense of the suit at its expense. The policy defines "[p]ersonal injury" to include "malicious prosecution[,] [l]ibel, slander or defamation of character." See note 3, *infra.*

On January 9, 1998, before Commerce insured Billings under the policy, Billings and others filed a civil action in the Superior Court (1998 action) against, among others, the trustees of the Peterson 1990 Real Estate Trust (trust), seeking to annul a decision of the zoning board of appeals of Falmouth regarding the issuance of a building permit on one lot within a thirty-three acre parcel owned by the trust, to enjoin construction on eight other lots within the parcel, and to enjoin the building commissioner from issuing any building permits for thirteen of the lots. On April 7, 2000, while Billings was insured by Commerce under the policy, the 1998 action was dismissed after the parties reported the action settled but failed to file the settlement agreement within the period prescribed by the court.

On December 14, 2000, Scott M. Peterson and Eric M. Peterson, individually and as trustees of the trust, filed a civil action in the Superior Court against the plaintiffs in the 1998 action (including Billings), alleging, among other claims, malicious prosecution and intentional infliction of emotional distress (2000 action).[1] The malicious prosecution claim was based on the filing of the 1998 action; the intentional infliction of emotional distress claim allegedly arose from the conduct of Billings and his co-defendants in filing that action and in "spreading rumors that the [Petersons] would fill the wetlands and build [sixteen] houses in the marsh."

After the 2000 action was filed, Billings forwarded a copy of the complaint to Commerce and asked Commerce to defend him in the action. Commerce declined to provide a defense, contending that "there is no allegation in the [c]omplaint of an offense *which was committed during the coverage period*" (emphasis in original). At his own expense, Billings retained an

---

[1]The other claims were abuse of process and negligent infliction of emotional distress. Neither of these claims affects the determination of insurance coverage.

attorney to litigate the 2000 action. In December, 2005, a jury returned a verdict in favor of Billings and the other defendants.

On January 26, 2006, Billings filed this declaratory judgment action against Commerce, seeking a declaration that it had a duty to defend him in the 2000 action, as well as actual and punitive damages under G. L. c. 93A for Commerce's alleged unfair insurance practices in violation of G. L. c. 176D, § 3 (9). A judge in the Superior Court allowed Commerce's cross motion for summary judgment as to all of Billings's claims, concluding that Commerce did not owe Billings a duty to defend the 2000 action, and denied Billings's motion for summary judgment. Billings appealed, and we transferred the appeal to this court on our own motion.

The appeal poses two issues. First, where, as here, a civil action is filed against a policyholder alleging a claim of malicious prosecution, and coverage under the liability policy is based on the date of the "occurrence" rather than the date of the claim, is the date of the "occurrence" when the underlying, allegedly malicious action is filed or when that action is terminated? We join the majority of courts that have adjudicated this issue in concluding that the "occurrence" is the filing of the malicious action, not its termination.

Second, is the allegation in the complaint that Billings and the other defendants were "spreading rumors that the [Petersons] would fill the wetlands and build [sixteen] houses in the marsh" reasonably susceptible of an interpretation that states or roughly sketches a claim for damages because of "personal injury" arising from "[l]ibel, slander or defamation of character"; and, if so, did the claim occur within the policy period? We conclude that, in the circumstances of this case, the allegation is reasonably susceptible of an interpretation that roughly sketches a claim for libel, slander, or defamation, but it is not reasonably susceptible of an interpretation that any defamatory statement occurred during the policy period.[2]

1. *When is the date of "occurrence" of the tort of malicious prosecution?* To prevail on a claim of malicious prosecution, a plaintiff must prove that the defendant instituted a prior civil or criminal proceeding without probable cause and with improper

---

[2]We acknowledge the amicus brief of the American Insurance Association.

purpose, and that the prior proceeding terminated in favor of the plaintiff (who was the defendant in the prior proceeding). See *Chervin* v. *Travelers Ins. Co.*, 448 Mass. 95, 103-113 (2006); *Hubbard* v. *Beatty & Hyde, Inc.*, 343 Mass. 258, 261 (1961). See generally 2 Massachusetts Superior Court Civil Practice Jury Instructions § 22.1, at 22-1—22-2 (Mass. Cont. Legal Educ. 2d ed. 2008). Under the policy, Commerce owes Billings a duty to defend against a law suit brought against him for damages arising from malicious prosecution if the alleged damages were caused by an "occurrence," that is, an offense committed within the coverage period.[3] Billings contends that the offense of malicious prosecution does not occur under the policy until the termination of the underlying prior proceeding; Commerce contends that it occurs when the malicious action was filed.

The majority of jurisdictions that have considered the issue have concluded that the "occurrence" causing personal injury under an insurance policy is the filing of the underlying malicious suit, not its termination. See *Erie* v. *Guaranty Nat'l Ins. Co.*, 109 F.3d 156, 163 (3d Cir. 1997) (applying Pennsylvania law, "tort of malicious prosecution occurs for insurance purposes at the time the underlying charges are filed"); *Selective Ins. Co.* v. *Paris*, 681 F. Supp. 2d 975, 983 (C.D. Ill. 2010) (applying Illinois law; tort of malicious prosecution occurred for insurance purposes at time criminal charges were filed); *North River Ins. Co.* v. *Broward County Sheriff's Office*, 428 F. Supp. 2d 1284, 1291 (S.D. Fla. 2006) (applying Florida law; "an 'occurrence' in a malicious prosecution case . . . is the date the [p]laintiffs in the [u]nderlying [c]omplaints were actually harmed, not the date they were allegedly vindicated"); *Royal Indem. Co.* v. *Werner*, 784 F.

---

[3]The pertinent provisions of the policy provide:

"If a suit is brought against an 'insured' for damages because of . . . 'personal injury' . . . caused by an 'occurrence' to which this policy applies, 'we' will provide a defense . . . ."

" 'Occurrence' means: . . . a. An accident . . . which results, during the coverage period, in 'bodily injury' and/or 'property damage'; or b. An offense, including a series of related offenses, committed during the coverage period, which results in 'personal injury'."

" 'Personal injury' means: 1. False arrest, detention or imprisonment, or malicious prosecution; 2. Libel, slander or defamation of character."

Supp. 690, 692 (E.D. Mo.), aff'd, 979 F.2d 1299, 1300 (8th Cir. 1992) (applying Missouri law); *Ethicon, Inc.* v. *Aetna Cas. & Sur. Co.*, 688 F. Supp. 119, 124, 127 (S.D.N.Y. 1988) (applying New Jersey law; in "criminal or civil prosecution that is malicious . . . injury begins to flow from the time when the complaint is filed"). See also *Zurich Ins. Co.* v. *Peterson*, 188 Cal. App. 3d 438, 448 (1986); *S. Freedman & Sons* v. *Hartford Fire Ins. Co.*, 396 A.2d 195 (D.C. 1978); *Paterson Tallow Co.* v. *Royal Globe Ins. Cos.*, 89 N.J. 24, 31 (1982); *Newfane* v. *General Star Nat'l Ins. Co.*, 14 A.D.3d 72, 79 (N.Y. 2004).

The time of the "occurrence" under an indemnity policy "is not the time the wrongful act was committed, but the time when the complaining party was actually damaged." *Continental Cas. Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 152 (1984), quoting *Bartholomew* v. *Insurance Co. of N. Am.*, 502 F. Supp. 246, 252 (D.R.I. 1980), aff'd sub nom. *Bartholomew* v. *Appalachian Ins. Co.*, 655 F.2d 27 (1st Cir. 1981). See *A.W. Chesterton Co.* v. *Massachusetts Insurers Insolvency Fund*, 445 Mass. 502, 520 n.10 (2005) (same); *Frohberg* v. *Merrimack Mut. Fire Ins. Co.*, 34 Mass. App. Ct. 462, 464 (1993) (same). A plaintiff suffers actual damages from a malicious prosecution on the filing of the underlying complaint, which at a minimum triggers the need to invest the time, money, and effort to prepare a defense.[4] While the termination of the underlying action is a required element and a necessary condition precedent before the malicious prosecution claim accrues for purposes of the statute of limitations, it is not an event that causes harm to the plaintiff and therefore not an "occurrence" within the meaning of the policy.

The minority of courts, of which we find only two, seek to divorce the definition of "occurrence" under the policy from the damage caused by the conduct, concluding that the time of

---

[4]While the "occurrence" in this case for purposes of liability coverage is "an offense" that results in personal injury, rather than "an accident" that results in bodily injury or property damage, we discern no difference between an "offense" and an "accident" that should affect the time of the "occurrence." In both categories of "occurrence," it is the actual damages suffered by the complainant that triggers the potential liability for which a liability policy provides coverage. See *Appalachian Ins. Co.* v. *Liberty Mut. Ins. Co.*, 676 F.2d 56, 62 (3d Cir. 1982) (where class action claimed sex discrimination based on company's employment policy, "occurrence" under liability policy takes place when injuries arising from policy "first manifest themselves").

"occurrence" of a malicious prosecution is when the final element of the tort is satisfied. See *Security Mut. Cas. Co.* v. *Harbor Ins. Co.*, 65 Ill. App. 3d 198, 206 (1978), rev'd on other grounds, 77 Ill. 2d 446 (1979); *Roess* v. *St. Paul Fire & Marine Ins. Co.*, 383 F. Supp. 1231, 1233-1235 (M.D. Fla. 1974). Causing personal injury is fundamental to the definition of "occurrence" in an insurance policy. While the termination of the underlying action is the event that ripens a malicious prosecution claim and starts the clock on the statute of limitations, "[s]tatutes of limitation and triggering dates for insurance purposes serve distinct functions and reflect different policy concerns." *Erie* v. *Guaranty Nat'l Ins. Co.*, supra at 161. "Because of this fundamental difference in purpose, courts have consistently rejected the idea they are bound by the statutes of limitation when seeking to determine when a tort occurs for insurance purposes." *Id.*, and cases cited.

We also reject Billings's suggestion that malicious prosecution be treated as a continuing tort for the duration of the underlying litigation, and that an "occurrence" under the policy continues from the date the underlying malicious complaint was filed until the termination of that underlying litigation. A malicious prosecution is not a tort where it is difficult to ascertain when the injurious effects of the tortious conduct first become manifest; any reasonable person recognizes that the injury occurs on the filing. See *Cole* v. *Pulley*, 18 Mass. App. Ct. 950, 951 (1984) ("Unlike the asbestos-caused latent injuries . . . the injury to the person maliciously prosecuted is apparent the day he is served with process").[5] It is clearer, simpler, and fairer to define the time of the "occurrence" as the time the injurious effects "first became apparent," i.e., the date of filing. *Erie* v. *Guaranty Nat'l Ins. Co.*, supra at 162.

Because the Commerce policy did not insure Billings until March 15, 2000, and the time of "occurrence" was the filing of

---

[5] We conclude that the "occurrence" is the date of the filing of the malicious underlying complaint rather than the date of service of process because the filing date is more easily ascertained than the date of service. This distinction, however, is of no consequence in this case because Commerce Insurance Company (Commerce) would have no duty to defend this malicious prosecution claim even if we were to determine that the "occurrence" was the date of service.

the underlying malicious prosecution action in 1998, the filing of the action was not "an 'occurrence' to which this policy applies" and Commerce had no duty to defend based on this claim of coverage.

2. *Does Commerce have a duty to defend arising from the "spreading rumors" allegation in the intentional infliction of emotional distress claim?* An insurer has a duty to defend an insured when the allegations in a complaint are reasonably susceptible of an interpretation that states or roughly sketches a claim covered by the policy terms.[6] *Ruggerio Ambulance Serv., Inc.* v. *National Grange Mut. Ins. Co.,* 430 Mass. 794, 796 (2000). The duty to defend is determined based on the facts alleged in the complaint, and on facts known or readily knowable by the insurer that may aid in its interpretation of the allegations in the complaint.[7,8] See *Boston Symphony Orchestra, Inc.* v. *Commercial Union Ins. Co.,* 406 Mass. 7, 10-11 (1989); *Desrosiers* v. *Royal Ins. Co.,* 393 Mass. 37, 40 (1984). "In order for the duty of defense to arise, the underlying complaint need

---

[6]The often-repeated language is that "an insurer has a duty to defend an insured when the allegations in a complaint 'are "reasonably susceptible" of an interpretation that they state or adumbrate a claim covered by the policy terms.' " *Ruggerio Ambulance Serv., Inc.* v. *National Grange Ins. Co.,* 430 Mass. 794, 796 (2000), quoting *Liberty Mut. Ins. Co.* v. *SCA Servs., Inc.,* 412 Mass. 330, 332 (1992). The word "adumbrate," which derives from the Latin word for "to shadow," 1 Oxford English Dictionary 180 (2d ed. 1989), means "to outline in a shadowy way; sketch." Webster's New World Dictionary 19 (3d ed. 1988). Because "adumbrate" is so rarely used in common parlance, we replace it with the words "roughly sketch," which reflects the shadowy outline intended by the use of the word "adumbrate."

[7]We acknowledge that in *Boston Symphony Orchestra, Inc.* v. *Commercial Union Ins. Co.,* 406 Mass. 7, 10-11 (1989), we said that "the duty to defend is based on the facts alleged in the complaint and those facts which are known by the insurer." However, we cited *Desrosiers* v. *Royal Ins. Co.,* 393 Mass. 37, 40 (1984), in support of this assertion, which states that "the obligation of the insurer to defend is based not only on the facts alleged in the complaints but also on the facts that are known or *readily knowable* by the insurer" (emphasis added). We do not believe that the omission of "readily knowable" in *Boston Symphony Orchestra* was meant to revise the *Desrosiers* standard, where that issue was not raised by the facts of the *Boston Symphony Orchestra* case and was not discussed in the opinion.

[8]The Appeals Court has recognized a "rare" exception to this rule where there exists "an undisputed extrinsic fact that takes the case outside the coverage and that will not be litigated at the trial of the underlying action." *Farm Family Mut. Ins. Co.* v. *Whelpley,* 54 Mass. App. Ct. 743, 747 (2002).

only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage." *Sterilite Corp.* v. *Continental Cas. Co.*, 17 Mass. App. Ct. 316, 319 (1983), quoting *Union Mut. Fire Ins. Co.* v. *Topsham*, 441 A.2d 1012, 1015 (Me. 1982). "However, 'when the allegations in the underlying complaint "lie expressly outside the policy coverage and its purpose, the insurer is relieved of the duty to investigate" or defend the claimant.' " *Herbert A. Sullivan, Inc.* v. *Utica Mut. Ins. Co.*, 439 Mass. 387, 394-395 (2003), quoting *Timpson* v. *Transamerica Ins. Co.*, 41 Mass. App. Ct. 344, 347 (1996).

The fact that the complaint in the 2000 action did not state a claim for defamation, libel, or slander is not decisive in determining whether it is reasonably susceptible of an interpretation that states or roughly sketches a claim for damages because of "personal injury" arising from "libel, slander or defamation of character." See *Boston Symphony Orchestra, Inc.* v. *Commercial Union Ins. Co.*, *supra* at 12 (allegations in breach of contract claim fell within coverage for claims of injury arising from publication of "disparaging material"). "The process is not one of looking at the legal theory enunciated by the pleader but of 'envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.' " *Id.* at 12-13, quoting *Continental Cas. Co.* v. *Gilbane Bldg Co.*, 391 Mass. 143, 147 (1984).

We conclude that the allegation in the complaint that Billings "spread[] rumors that [the Petersons] would fill the wetlands and build [sixteen] houses in the marsh," although pleaded in support of a claim of intentional infliction of emotional distress, is reasonably susceptible of an interpretation that roughly sketched a claim of libel, slander, or defamation, whose defense is covered under the terms of the policy. The allegation stated that the rumors were intended to inflict emotional distress on the Petersons, that spreading them was "extreme and outrageous conduct," and that their spread, along with the malicious filing of the 1998 action, caused Scott Peterson such emotional distress that he was

hospitalized and required further medical care on his release. These allegations suggest that the rumors were known to be false and defamatory, and that they damaged the Petersons' reputation, which presumably was one of the reasons for Scott Peterson's severe emotional distress. In doing so, they roughly sketched a defamation claim. See *Jones* v. *Taibbi*, 400 Mass. 786, 799 (1987) (where plaintiff in defamation action is private person, "he need prove only the negligent publication of a defamatory falsehood to recover from the defendants for actual damages"). See also *Ravnikar* v. *Bogojavlensky*, 438 Mass. 627, 629-630 (2003) (setting out elements of defamation).

In addition, the reasonable implication from the alleged rumor was that the Petersons intended to fill wetlands and build homes there without the required approvals from the local conservation commission and State environmental agencies. This implied that they intended to violate Massachusetts law, which makes it a crime to fill wetlands without receiving and complying with an order of conditions. See G. L. c. 131, § 40. Because the allegation roughly sketched a defamation claim that accused the plaintiffs of a crime, the claim did not require proof of economic loss. See *Ravnikar* v. *Bogojavlensky*, *supra* at 630. In short, the rumor allegation was reasonably susceptible of an interpretation that Billings had defamed the Petersons by accusing them of being environmental criminals.

We note that Commerce's representative, when she was deposed in the instant case, agreed that the allegation regarding the rumors constituted an offense under the terms of the policy that, had it happened within the coverage period, would have triggered a duty to defend. While statements of Commerce's designee cannot establish as a matter of law that the allegations are reasonably susceptible of an interpretation that state a claim covered by the policy terms where the policy's clear language indicates otherwise, we may consider such an admission in determining whether the allegations are reasonably susceptible of such an interpretation. Cf. *Home Ins. Co.* v. *Liberty Mut. Fire Ins. Co.*, 444 Mass. 599, 603-604 (2005) (statements of insurer's designee at deposition, "reciting his understanding of the declarations pages, cannot establish as a matter of law that [company] was an insured under the policies if the policies' clear language indicates otherwise").

The "spreading rumors" allegation, however, triggers Commerce's duty to defend only if the allegations, interpreted with the aid of facts known or readily knowable by the insurer, are reasonably susceptible of an interpretation that these rumors were spread during the policy period. We conclude that they are not.

The 2000 action brought by the Petersons, for which Billings sought a defense from Commerce, was based primarily on the malicious prosecution of the 1998 action, which the complaint in the 2000 action states was dismissed on April 7, 2000, less than one month after the Commerce policy became effective on March 15, 2000. The complaint in the 2000 action does not identify the time period in which the rumors were spread, so we need to determine whether the complaint is reasonably susceptible of an interpretation that the rumors were spread between March 15 and April 7, 2000.[9]

There are two reasons, each sufficient by itself, why the complaint is not reasonably susceptible of such an interpretation. First, the complaint in the 2000 action alleges that Scott Peterson "suffered foreseeable physical injuries caused by the . . . negligent filing of the [1998] action and spreading of rumors about filling the wetlands and building [sixteen] houses in the marsh"; and that the emotional distress that caused his hospitalization "followed closely on the heels of the negligent acts of . . . filing the action." Because the initial complaint in the 1998 action was filed on January 9, 1998, it is not reasonable to infer from these allegations that the rumors alleged were spread after March 15, 2000. The reasonable implication is that the rumors were spread at or around the time the complaint was filed in 1998.

Second, the judgment of dismissal for the 1998 action that issued on April 7, 2000, declares that the parties reported the action settled but failed to file the agreement with the court within the prescribed period. The reasonable inference is that

---

[9]The focus is on the spreading of the rumors, not on the initiation of the rumors, because, "[g]enerally speaking, the republisher of a defamatory statement 'is subject to liability as if he had originally published it.'" *Appleby* v. *Daily Hampshire Gazette*, 395 Mass. 32, 36 (1985), quoting Restatement (Second) of Torts § 578 (1977). Each defamatory communication constitutes a new cause of action. See *Flynn* v. *Associated Press*, 401 Mass. 776, 780 n.5 (1988); Restatement (Second) of Torts, *supra* at § 577A.

the case had been reported settled before April 7, an order had issued requiring the parties to file the settlement agreement within a prescribed period, and, at some time after that deadline, the court dismissed the case. The docket in the 1998 action does not reflect the length of the prescribed period (or the existence of such an order),[10] but it is reasonable to infer that the prescribed period was at least twenty days to allow the reported settlement agreement to be finalized, signed by all parties, and submitted to the court.[11] Consequently, from the judgment of dismissal alone, it is reasonable to infer that the settlement was reported no earlier than on or around March 15, 2000, the date the policy commenced. Even if the settlement had been reported after March 15, it is not reasonable to infer that Billings defamed the Petersons after March 15, because the case would not likely have settled before April 7 if he had.

In fact, information readily knowable by Commerce from publicly available court records demonstrated that Billings's dispute with the trust had settled well before coverage commenced on March 15, 2000. The 1998 action was only the first of three lawsuits brought by Billings and others against the trust in 1998 with respect to development of the thirty-three acre parcel. Two other cases sought to annul decisions of the zoning board of appeals of Falmouth regarding two lots in that parcel.[12] The judgments of dismissal in these two actions were entered on September 29, 1999, more than six months before coverage under the policy commenced, after the parties reported these actions settled.[13] It is reasonable to infer that the same settlement agreement resolved all of the cases. It is therefore reasonable to infer that the 1998 action settled before September 29, 1999.[14]

[10]The docket in the 1998 action reflects only the filing of the complaint on January 9, 1998; the disposal of the case on April 7, 2000; and the entering of the case "for indexing purposes" on October 17, 2003. It does not reflect the existence of the amended complaint filed on April 28, 1998.

[11]We know of no rule governing the length of the nisi period following a settlement agreement in the Superior Court, but recognize that such an order is often referred to as a twenty-day or thirty-day order.

[12]The record is silent as to why these two cases were not included within the Petersons' claim of malicious prosecution in the 2000 action.

[13]In these cases, too, the judgment of dismissal entered after the settlement agreement had not been filed within the prescribed period.

[14]The record reflects that the settlement agreement in the 1998 action was

In light of this undisputed, readily knowable, and publicly available information, the allegations of the complaint in the 2000 action are not reasonably susceptible of an interpretation that Billings spread any of the alleged rumors after March 15, 2000, when coverage commenced.

We recognize that the only inquiry regarding coverage that Commerce conducted, apart from studying the complaint in the 2000 action, consisted of telephone conversations with Billings on January 25, 2001, in which he said that he took no action after April 7, 2000, and thought that, once the 1998 action was concluded, that was the end of it.[15] There is no evidence that Commerce had retrieved a copy of the judgment of dismissal in any of the three related cases, or knew of the other two cases. In determining whether an insurer has a duty to defend, we look not only to the allegations in the complaint and to the information known to the insurer that may aid in interpreting and understanding those allegations, but also to information readily knowable by the insurer. See *Desrosiers* v. *Royal Ins. Co.*, 393 Mass. 37, 40 (1984); *Terrio* v. *McDonough*, 16 Mass. App. Ct. 163, 167 (1983), and cases cited. The content of publicly available court records in the underlying case and related cases is readily knowable by an insurer and, where that information is relevant to the duty to defend, may be considered in deciding whether the insurer had a duty to defend. A policyholder is not entitled to a defense where court records in the case where the policyholder was a party demonstrate that the insurer has no duty to defend.

*Conclusion.* Because the allegations in the complaint in the 2000 action are not reasonably susceptible of an interpretation that they state or roughly sketch a claim covered by the policy terms within the coverage period, we conclude that Commerce had no duty to defend Billings in that action.[16] The judge's

---

executed in March, 1999, but the settlement agreement was not seen by Commerce before it declined coverage, and was not readily knowable to Commerce from publicly available court records.

[15]The record is silent as to whether Billings was asked if and when the 2000 action had settled.

[16]In view of this conclusion, we do not reach Billings's claim that Commerce's denial of a defense was an unfair insurance practice in violation of G. L. c. 176D, § 3 (9), or G. L. c. 93A.

allowance of Commerce's cross motion for summary judgment and her denial of Billings's motion for summary judgment are affirmed.

*So ordered.*