SUPERIOR COURT 
 
 MEDMARC CASUALTY INSURANCE COMPANY v. HARVARD BIOSCIENCE, INC. AND BIOSTAGE, INC.

 
 Docket:
 2184CV02093-BLS2
 
 
 Dates:
 January 24, 2022
 
 
 Present:
 Kenneth W. Salinger Justice of the Superior Court
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 MEMORANDUM AND ORDER ALLOWING DEFENDANT’S MOTION FOR A PRELIMINARY INJUNCTION
 
 

             Harvard Bioscience, Inc. (which calls itself “HBIO”) and Biostage, Inc., are defendants in a wrongful death action. The plaintiffs in that case claim that a patient’s damaged trachea was replaced with synthetic tracheas created using technology developed by HBIO and Biostage, the implants failed, and the patient died as a result. Medmarc Casualty Insurance Company issued a Life Sciences Products/Completed Operations Liability Coverage policy that provides HBIO and Biostage with certain insurance coverage for the “trachea scaffold device” and the “InBreath Organ Bioreactor” used to create these implants.[1] Under the policy, Medmarc has a duty to defend against any claim for bodily injury to which the policy applies, and a separate duty to indemnify these Insureds for damages they are obligated to pay because of such injury.
            Medmarc provided a defense to the underlying action for more than four years. But in September 2021 Medmarc told HBIO and Biostage that it would stop providing any defense and paying any defense costs at the end of the month, and filed this action seeking a declaratory judgment that it is not required to continue defending or to indemnify these Insureds. In turn, HBIO and Biostage assert counterclaims seeking, among other things, a declaratory judgment that Medmarc has a continuing duty to pay the cost of defending them, plus damages for Medmarc’s alleged breach of its duty to defend.
            HBIO and Biostage have moved for a preliminary injunction that would compel Medmarc to continue paying their defense costs until there has been a final adjudication of Medmarc’s defense obligations. The Court will exercise its broad discretion and allow that motion because it finds that HBIO and Biostage have proven that Medmarc is currently in breach of its duty to defend them in
 
-------------------------------------
 
[1] The procedure involves harvesting stem cells from the patient’s bone marrow, seeding those stem cells onto a scaffold in a bioreactor, and then implanting the seeded scaffold in the patient.
 
                                                            -1-
 
the underlying case, are very likely to succeed in proving that Medmarc has a continuing duty to pay for that defense, and will probably be irreparably harmed if Medmarc does not resume paying their defense costs.[2] [3]
            1. Legal Background—An Insurer’s Duty to Defend. The following legal principles govern Medmarc’s potential duty to defend the underlying lawsuit against Biostage and HBIO.
            A liability insurer’s duty to defend its insured “is independent from, and broader than, its duty to indemnify.” Holyoke Mut. Ins. Co. in Salem v. Vibram USA, Inc., 480 Mass. 480, 483 (2018), quoting Metropolitan Prop. & Cas. Ins. Co. v. Morrison, 460 Mass. 352, 357 (2011).
A duty to defend “is triggered when the allegations in the complaint [against the insured] ‘are reasonably susceptible of an interpretation that states or roughly sketches a claim covered by the policy terms.’ “ Holyoke Mut., supra, at 484, quoting Billings v. Commerce Ins. Co., 458 Mass. 194, 200 (2010). In other words, an “insurer has the duty to defend an insured against a lawsuit based merely on the potential of liability under a policy,” even though “the insurer could eventually be determined to have no duty to indemnify the insured.” Metropolitan, supra, at 358, quoting 14 G. Couch, Insurance § 200:3, at 200–9 (3d ed. 2005). If one claim in the underlying action triggers a duty to defend, then “the insurer must defend the insured on all counts, including those that are not covered.” Mount Vernon Fire Ins. Co. v. VisionAid, Inc., 477 Mass. 343, 351 (2017).
            Whether an insurer is obligated to provide a defense must be determined, at least in the first instance, “by comparing the allegations in the third-party complaint against the provisions  in  the  insurance  policy.”  Holyoke  Mut., 480 Mass. at 484, quoting Deutsche Bank Nat’l Ass’n v. First Am. Title Ins. Co., 465 Mass.  741, 744–745 (2013). If  there is “a  possibility that the  liability claim
 
-------------------------------------
 
[2] “Trial judges have broad discretion to grant or deny injunctive relief.” Lightlab Imaging, Inc. v. Axsun Technologies, Inc., 469 Mass. 181, 194 (2014). “To obtain a preliminary injunction, the applicant must show a likelihood of success on the merits of the underlying claim; actual or threatened irreparable harm in the absence of injunction; and a lesser degree of irreparable harm to the opposing party from the imposition of an injunction.” Wilson v. Commissioner of Transitional Assistance, 441 Mass. 846, 860 (2004).
 
[3] Medmarc did not ask that HBIO and Biostage be required to post any bond if the preliminary injunction issues. The Court will therefore exercise its discretion not to require a bond.
 
                                                            -2-
 
falls within the insurance coverage,” then the duty to defend is triggered; “[t]here is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage.” Id., quoting Billings, 458 Mass. at 200–201.
            Any uncertainty about whether the underlying complaint includes a covered claim, and thus triggers the insurer’s duty to defend, must be “resolved in favor of the insured, and the insurer must undertake the defense until it obtains a declaratory judgment of no coverage.” Deutsche Bank, 465 Mass. at 745.
            There are two “narrow exceptions” to the rule that the duty to defend is determined only by looking at the allegations in the underlying complaint. See Metropolitan, 460 Mass. at 358. “Even where the allegations in the complaint state or roughly sketch a claim covered by a liability policy,” the insurer will nonetheless have no duty to keep defending the claim if: (1) “there is ‘undisputed, readily knowable, and publicly available information’ in court records that demonstrates that the insurer has no duty to defend,” Metropolitan, supra, quoting Billings, 458 Mass. at 205, or (2) “there is ‘an undisputed extrinsic fact that takes the case outside the coverage and that will not be litigated at the trial of the underlying action, id., quoting Billings at 200 n.8; accord Deutsche Bank, 465 Mass. at 745 n.10 (reaffirming Metropolitan).[4]
            Where an insurer and its insured disagree about whether there is a duty to defend, the insurer may provide a defense under a reservation of rights, file a declaratory judgment action to resolve whether it owes a duty to defend or indemnify, move to stay the underlying action in the meantime, and withdraw from the defense “if it obtains a declaration that it owes no duty to the insured.” Metropolitan, 460 Mass. at 358–359. “Where material facts as to the duty to indemnify are in dispute,” however, “an insurer has a duty to defend until the insurer establishes that no potential liability for coverage exists.” Id. at 359.
 
-------------------------------------
 
[4] Prior to Metropolitan, the Supreme Judicial Court had suggested more broadly that whether there is a duty to defend “is determined based on the facts alleged in the complaint, and on facts known or readily knowable by the insurer that may aid in its interpretation of the allegations in the complaint.” Billings, 458 Mass. at 200. But Metropolitan clarified, and Deutsche Bank confirmed, that Massachusetts permits consideration of facts outside the complaint—to determine whether an insurer has a duty to defend—only in the two narrow circumstances described above.
 
                                                            -3-
 
            The “narrow exceptions” described above do not apply unless and until they have been proved in court and result in a declaratory judgment stating that the insurer has no duty to defend. If it seems possible on the face of the complaint that the insurance policy covers claims asserted against the insured, then the insurer cannot escape its duty to defend based on “its own assertions that there is no coverage in fact;” an insurer that tries to do so, without obtaining a court judgment that it has no duty to defend, “stands in breach of its duty even if the third party fails in the end to support any such claim of liability by adequate proof.” Sterilite Corp. v. Continental Cas. Co., 17 Mass. App. Ct. 316, 324 (1983).
            Furthermore, if an insurer obtains a declaratory judgment that there is no coverage and thus no duty to defend, that decision “does not retroactively relieve the primary insurer of the duty to defend; it only relieves the insurer of the obligation to continue to  defend  after  the  declaration.”  Metropolitan,  460 Mass. at 359, quoting 14 G. Couch, Insurance, supra, § 200:48, at 200–65 to 200–66; accord Restatement of the Law of Liability Insurance § 21 (2019) (“Unless otherwise stated in the insurance policy or otherwise agreed to by the insured, an insurer may not obtain recoupment of defense costs from the insured, even when it is subsequently determined that the insurer did not have a duty to defend or pay defense costs.”)
            2. Likelihood of Success. HBIO and Biostage are likely to succeed in proving that the insurance policy issued by Medmarc is broad enough that it potentially covers the claims asserted in the underlying complaint, and that Medmarc therefore has a duty to defend HBIO and Biostage in that action. They have shown that Medmarc acted unlawfully by unilaterally stopping to provide or pay for that defense. And the Insureds are very likely to succeed in proving that the additional information upon which Medmarc now relies, gathered from reports by expert witnesses retained by the plaintiffs in the underlying case, may not be used by Medmarc to establish that the underlying claims fall outside Medmarc’s insurance coverage—and thus does not provide any basis for declaring that Medmarc’s duty to defend has ended.
            2.1. Parsing the Policy. The Insureds are likely to succeed in proving that the coverage provided by Medmarc’s policy is broader than Medmarc contends.
            Medmarc’s policy covers damages or claims arising out of the use of, or the Insureds’ work on or warranty of, “[t]he InBreath Organ Bioreactor, the Harvard Apparatus Clinical Infusion Pump Stem Cell Injector, and the trachea scaffold device, for research purposes only unless used [sic] on humans is
 
                                                            -4-
 
approved in accordance with hospital ethics committee protocols and local regulatory rules” (emphasis added). This language appears in an endorsement that imposes a “limitation of coverage to designated product(s) or work(s).”
            Medmarc contends that the undefined phrase “for research purposes only” bars coverage for any “use of the devices for the medical treatment of patients.” It argues that this provision therefore limits coverage to damages arising from “laboratory research” (a term that does not appear in the policy), “approved clinical trials,” or research based on use in a human patient that has been approved by a hospital ethics committee and local regulatory authorities. Medmarc insists that the policy does not cover damages arising from use of the Biostage technology in surgery undertaken for “experimental medical treatment” that is not part of a larger clinical research program because, in Medmarc’s view, such use would not be for “research purposes only.”
            There is an alternative and broader reading of this policy language, however. On its face, the policy appears to limit Medmarc’s coverage to damages or claims arising from or in connection with the use of a listed product either: (1) for any kind of “research purposes,” whether in or outside a laboratory setting, and including experimental treatment of human patients that is not part of a clinical trial involving multiple patients; or (2) on human subjects for a compassionate use, expanded access, or other non-research purpose allowed under “hospital ethics committee protocols and local regulatory rules.”
            This broader reading seems to be more consistent with other policy provisions. The policy covers not only the two named Insureds but also other unnamed insureds, including those conducting clinical testing on behalf of HBIO or Biostage. It defines “clinical testing” to include use of a “medical device” (a defined term) or other “therapeutic product or process” (an undefined phrase) for “compassionate use” purposes or as part of an “expanded access program” or “named patient program.” And it defines an expanded access or named patient program to mean “any program that allows patients who do not qualify for clinical trials to access new medications [or medical devices] for treatment purposes” before they are “licensed for marketing in their country, if no suitable alternative is available or exists.”[5]
 
-------------------------------------
 
[5] Though the definition of “expanded access programs” refers only to medications and not to medical devices, it must be read together with the definition of “clinical testing,” which expressly provides that it includes the use of a “medical device” in an expanded access program. Policy language that defines the scope of insurance coverage is “not to be construed in isolation, but only as a part of the entire insurance policy.” Save-Mor Supermarkets, Inc. v. Skelly Detective Serv., Inc., 359 Mass. 221, 226 (1971); accord Mejia v. American Casualty Co., 55 Mass. App. Ct. 461, 465 (2002) (court must construe insurance policy “as a whole,” rather than read provisions “in isolation”); see generally General Convention of the New Jerusalem in the United States of Am., Inc. v. MacKenzie, 449 Mass. 832, 835 (2007) (“The words of a contract must be considered in the context of the entire contract rather than in isolation.”).
 
                                                            -5-
 
These provisions, which afford coverage to third parties who use covered technology on behalf of the Insureds to treat patients as part of an expanded access program outside the context of a clinical trial, would be unnecessary and superfluous if the limitation of coverage provision barred such coverage for named and unnamed insureds alike. This suggests that Medmarc’s restrictive reading of the limitation of coverage provision is incorrect. See Oliveira v. Commerce Ins. Co., 94 Mass. App. Ct. 276, 280 (2018) (rejecting policy interpretation that would make part of definitions section unnecessary). “Every word in an insurance contract ‘must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable.’ ” Great Divide Ins. Co. v. Lexington Ins. Co., 478 Mass. 264, 270 (2017), quoting Boston Gas Co. v. Century Indem. Co., 454 Mass. 337, 355 (2009).
            In any case, since the limitation of coverage provision is ambiguous, and turns on wording that is not defined, the Court must construe the ambiguity against Medmarc and adopt the broader interpretation that favors its Insureds. An insurance policy provision is ambiguous if it could reasonably have more than one meaning, and reasonable people could disagree about which one is correct. Winbrook Communication Svcs., Inc. v. United States Liability Ins. Co., 89 Mass. App. Ct. 550, 556 (2016). When an insurance policy uses ambiguous language, “doubts as to the intended meaning of the words must be resolved against the insurance company that employed them and in favor of the insured.” Green Mountain Ins. Co. v. Wakelin, 484 Mass. 222, 226 (2020), quoting Boazova v. Safety Ins. Co., 462 Mass. 346, 350–351 (2012)). “This rule of construction applies with particular force to exclusionary provisions,” such as Medmarc’s limitation of coverage provision. See Metropolitan, 460 Mass. at 363, quoting Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 282 (1997).
            2.2. Duty to Defend Based on the Underlying Complaint. When the limitation of coverage provision is interpreted in the manner discussed above, the allegations in the underlying complaint state claims that could fall within the
 
                                                            -6-
 
scope of the insurance coverage provided in Medmarc’s policy.6 The complaint against the Insureds alleges that “the implantation of the synthetic trachea was clinical research” and “experimental” in nature. Thus, the complaint suggests that the tracheal scaffold device and bioreactor technology were being used for research purposes, within the meaning of Medmarc’s policy, which means that the damage claims are potentially covered by the duty to indemnify.
As a result, the filing of the underlying complaint triggered Medmarc’s duty to defend. See, e.g., Holyoke Mut., 480 Mass. at 484.
            Medmarc implicitly conceded as much by providing and paying for a defense to the underlying action without any objection or reservation of rights for over four years. Though Medmarc now contends that certain allegations in the underlying complaint bring those claims outside the scope of the insurance policy, Medmarc was well aware of those allegations during the long period when it conceded it had a duty to defend, hired counsel to represent HBIO and Biostage, and paid for their defense.
            That course of performance is compelling evidence that the underlying complaint against HBIO and Biostage triggered a duty by Medmarc to defend its named Insureds in that action. Cf. Keating v. Stadium Mgmt. Corp., 24 Mass. App. Ct. 246, 251–252 (1987) (fact that defendant’s predecessor paid commissions without reservation for six years showed commissions were owed under ambiguous contract provision). Where contract language is ambiguous, as it is here, “[t]here is no surer way to find out what parties meant, than to see
 
-------------------------------------
 
[6] Though Medmarc suggests in a footnote that policy provisions other than the limitation of coverage provision may also bar coverage of the underlying claims, it presents no argument in support of that conclusory assertion. The Court considers those points to have been waived for the purposes of the Insureds’ motion for a preliminary injunction. A party that opposes a motion in the Superior Court must submit a written memorandum “that includes a statement of reasons, with supporting authorities, that the motion should not be allowed.” Sup. Ct. Rule 9A(a)(2). Parties therefore waive issues or arguments that they do not raise and develop in their written opposition. An undeveloped assertion buried in a footnote does not satisfy the requirements of Rule 9A(a)(2). Cf. Boston Edison Co. v. Massachusetts Water Res. Auth., 459 Mass. 724, 726 n.3 (2011) (undeveloped argument relegated to footnote is waived); McCullen v. Coakley, 571 F.3d 167, 182 n.3 (1st Cir. 2009), cert. denied, 130 S.Ct. 1881 (2010) (“avoiding waiver requires more than a hint that a particular theory may be lurking; it necessitates some developed argumentation addressed to that particular theory”).
 
                                                            -7-
 
what they have done.” Brigade Leveraged Capital Structures Fund Ltd. v. PIMCO Income Strategy Fund, 466 Mass. 368, 378 (2013), quoting Brooklyn Life Ins. Co. of New York v. Dutcher, 95 U.S. 269, 273 (1877). What Medmarc did was to defend the underlying action for years, without any reservation of rights, which it presumably would not have done if the facts alleged in the underlying complaint did not clearly trigger Medmarc’s duty to defend.
            2.3. Unilateral Termination of Defense. HBIO and Biostage have also shown that Medmarc breached its duty to defend by withdrawing and refusing to pay for any defense without first obtaining a court order allowing it to do so.
            Medmarc asserts that expert reports produced by the plaintiffs in the underlying action against its Insureds include “summaries of factual information” that show the claims in that action are not within the scope of Medmarc’s insurance coverage, and thus that Medmarc no longer has any duty to defend the Insureds.
            Under Massachusetts law, however, an insurer may not unilaterally withdraw a defense based on new facts outside the scope of the underlying complaint. An insurer may not “escape its duty to defend the insured against a liability arising on the face of the complaint and policy, by dint of its own assertion that there is no coverage in fact;” if it does so without obtaining a court order terminating the duty to defend, then the insurer “stands in breach of its duty even if the third party fails in the end to support any such claim of liability by adequate proof.” Sterilite Corp., 17 Mass. App. Ct. at 324; accord Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 832 (2014) (insurer “stood in breach of its duty” when it “ ’disclaimed a duty to defend without first obtaining a judicial declaration’ ”) (quoting Metropolitan, 460 Mass. at 359).
            Though Medmarc filed this action for declaratory judgment, it must continue to defend its Insureds unless and until it obtains a final judgment declaring that its duty to defend has been terminated. See Arrow Auto. Indus., Inc. v. Liberty Mut. Ins. Co., 8 Mass.L.Rptr. 225, 1998 WL 52274, at *7 (Mass. Super. Ct. Jan. 29, 1998) (Fabricant, J.) (applying Sterilite). As noted above, any uncertainty about whether the underlying complaint triggers the insurer’s duty to defend, must be “resolved in favor of the insured, and the insurer must undertake the defense until it obtains a declaratory judgment of no coverage” (emphasis added). Deutsche Bank, 465 Mass. at 745.
 
                                                            -8-
 
Medmarc’s failure to continue to defend its Insureds, without first obtaining a judgment declaring that it no longer had any duty to do so, was a breach of contract. See Sterilite and Auto Flat Car Crushers, supra.
            2.4. Duty to Defend Based on Additional Information. HBIO and Biostage are also very likely to succeed in proving that Medmarc is not entitled to declaratory relief terminating its duty to defend the underlying action. Medmarc contends that expert reports disclosed by the plaintiffs in that case, and the evidence that they discuss, establish that the claims against the Insureds are not covered by the Medmarc Policy. Under Massachusetts law, however, an insurer is not relieved of its duty to defend based on contested expert reports and incomplete evidence offered against its insured in the underlying action.
            As noted above, newly developed extrinsic facts about underlying claims will cut off an insurer’s duty to defend only if those facts are “undisputed” and “will not be litigated at the trial  of  the  underlying  action.”  Metropolitan,  460 Mass. at 358, quoting Billings at 200 n.8. Medmarc’s assertion that an insurer that has been providing a defense may stop doing so whenever “the facts developed in the case show that the claims are outside the scope of coverage provided” is incorrect.[7]
            Here, HBIO and Biostage vigorously dispute the conclusions of the underlying plaintiff’s experts and the accuracy and completeness of the facts upon which those witnesses rely. The dispute about the underlying facts will have to be litigated and resolved in the underlying case, not here.
            As a result, Medmarc will most likely lose its claim seeking a declaratory judgment that it is entitled to terminate its defense of the underlying action, and its Insureds will most like succeed in showing that Medmarc has a
 
-------------------------------------
 
[7] Medmarc’s reliance on Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387 (2003), in support of this argument is misplaced. In Sullivan, the insurer’s duty to defend was terminated because the plaintiff in the underlying case filed an amended complaint with new allegations that were no longer reasonably susceptible of an interpretation that would state or even roughly sketch a covered claim. Id. at 395. Sullivan applied the rule that an insurer is relieved of its duty to defend “when the allegations in the underlying complaint ‘lie expressly outside the policy coverage.’ ” Id. at 394–395, quoting Timpson v. Transamerica Ins. Co., 41 Mass. App. Ct. 344, 347 (1996). It did not involve the development of new facts or evidence outside of the underlying complaint.
 
                                                            -9-
 
continuing duty to defend. See President & Fellows of Harvard College v. Westchester Fire Ins. Co., Suffolk Super. Ct. No. 0984CV05398-BLS2, 28 Mass. L. Rptr. 113, 2011 WL 679846, at *9 (Mass. Super. Ct. Feb. 24, 2011) (Fabricant, J.) (allowing insured’s motion for summary judgment).
            3. Irreparable Harm and Balance of Harms. Since the Insureds have shown that they have a substantial chance of succeeding on the merits of their claims that Medmarc is not entitled to stop defending them in the underlying action, their proof that they will suffer irreparable harm if the requested preliminary injunction is more than adequate.[8]
            “What matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits.” Hull Municipal Lighting Plant v. Massachusetts  Mun.  Wholesale  Elec.  Co.,  399  Mass.  640,  644  (1987),  quoting Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616 (1980). Thus, irreparable harm must be measured together with likelihood of success on a “sliding scale.” Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009). “Simply stated, more of one excuses less of the other.” EEOC v. Astra USA,  Inc.,  94  F.3d   738,  743  (1st Cir.   1996), quoting Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150 153 (6th Cir. 1991). Thus, “when the likelihood of success on the merits is great,” as in this case, a court may issue a preliminary injunction based on a lesser showing of irreparable harm. Vaqueria Tres Monjitas, supra, quoting Astra USA, supra.
            If the Court does not issue the requested preliminary injunction, then Biostage would have to bear the entire cost of defending the underlying action unless and until it could no longer do so. Biostage used to be part of and was spun-off from HBIO. As part of the spin-off, Biostage is contractually obligated to indemnify  HBIO  against  any  liabilities  incurred  in  connection  with  its
 
-------------------------------------
 
[8] Medmarc asked for more time to conduct discovery into whether its Insureds face irreparable harm because of Medmarc’s improper termination of its defense of the underlying action. This request is unavailing. HBIO and Biostage told Medmarc they intended to seek a preliminary injunction in mid-October 2021, served their preliminary injunction motion in early November 2021, and conferred with Medmarc in an attempt to resolve or narrow their disagreement a week later. Medmarc had ample time to seek discovery relevant to the preliminary injunction motion in the intervening months. It chose not to do so.
 
                                                            -10-
 
regenerative medicine business, which includes the tracheal implants and technology at issue in this case.
            The Court credits Biostage’s evidence that its cash on hand is far less than what it will likely cost to fund its defense through trial and that—in part because of Medmarc’s unilateral decision to stop defending its Insureds—Biostage is unable to raise additional funds. Though Biostage has obtained approval from the Food and Drug Administration to start a clinical trial for its esophageal implant in patients, it does not have—and, due to Medmarc’s unlawful conduct cannot raise—the funds needed to do so.
            Crediting Biostage’s affidavit, the Court finds that Medmarc’s continuing failure to pay for the defense in the underlying action poses an existential threat to Biostage that may force it to file for bankruptcy protection and quite possible force it to sell its assets, stop all its research efforts, and go out of business.
            Though the only harm from Medmarc’s continuing failure to pay defense costs is economic, Biostage has adequately shown that this constitutes irreparable harm because it “threatens the very existence” of Biostage’s business. See Hull Municipal Lighting Plant v. Massachusetts Mun. Wholesale Elec. Co., 399 Mass. 640, 643 (1987) (affirming preliminary injunction, and holding that failure to make required monthly payments pending arbitration constituted irreparable harm because it threatened “very existence” of moving party’s business).
            It appears that the defense of Biostage in the underlying action is inseparable from the defense of HBIO. Medmarc has not argued to the contrary. It follows that the need to prevent Biostage from suffering irreparable harm, as discussed above, would be sufficient to justify issuing the requested preliminary injunction even if HBIO did not face its own irreparable harm.
            But HBIO has shown that it also faces irreparable harm. If the preliminary injunction does not issue and Biostage cannot pay to defend the underlying action, which seems likely, then HBIO would have to do so. That would not pose an existential threat to HBIO, as it could afford to pay for the defense.  To do so, however, HBIO would have to divert funds that it would otherwise use for time-sensitive research and development.
            It is quite possible that HBIO would miss out to competitors in developing business opportunities if it is forced to take money that it would otherwise use to fund ongoing research and instead use it pay for defense costs that Medmarc is contractually obligated to cover.
 
                                                            -11-
 
HBIO is entitled to a preliminary injunction to protect it against such harm. An irreparable injury is any harm that “cannot be vindicated by litigation on the merits.” Koshy v. Sachdev, 477 Mass. 759, 770 (2017). The loss of business opportunities whose value cannot readily be quantified is therefore a form of irreparable harm. See Arizona Dream Act Coalition v. Brewer, 757 F.3d 1053, 1068 (9th Cir. 2014); MacGinnitie v. Hobbs Group, LLC, 420 F.3d 1234, 1242 (11th Cir. 2005); Veracode, Inc. v. Appthority, Inc., 137 F.Supp.3d 17, 89 (D.Mass. 2015) (Woodlock, J.).
            Finally, the Court concludes that the balance of harms favors HBIO and Biostage. That is, the risk of irreparable harm to Biostage if the preliminary injunction does not enter outweighs the risk of irreparable harm to Medmarc if it is required to keep paying the Insureds’ defense costs. Indeed, Medmarc has not argued that it will suffer any irreparable harm if the Court allows the motion for a preliminary injunction.
            4. Attorneys’ Fees. Where an insured goes to court and shows that the insurer has breached its duty to defend, the insured is entitled to recover any reasonable attorneys’ fees and other litigation expenses that it incurred to do so. See Hanover Ins. Co. v. Golden, 436 Mass. 584, 586–588 (2002); Preferred Mut. Ins. Co. v. Gamache, 426 Mass. 93, 98 (1997). Since HBIO and Biostage have shown that Medmarc breached its duty to defend by unilaterally terminating its defense of the underlying action, and that they are entitled to preliminary injunctive relief, they are also entitled to recover their reasonable attorneys’ fees and litigation costs. If the parties cannot reach agreement as to the amount of that recovery, the Insureds shall serve a motion and supporting papers seeking such relief.
ORDERS
            Defendants’ motion for a preliminary injunction is allowed. The Court will issue a preliminary injunction that requires Plaintiff to continue to pay the reasonable costs incurred by Defendants to defend themselves against the underlying action. Defendants are not required to post any bond. In addition, Defendants are entitled to recover any reasonable attorneys’ fees and costs they incurred to obtain this relief.
 
@/s/Kenneth W. Salinger Justice of the Superior Court
 
@January 24, 2022
 
                                                            -12-